# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH DAKOTA
## WESTERN DIVISION

| | |
|---|---|
| OGLALA SIOUX TRIBE, a federally recognized Indian tribe,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA;<br><br>DEB HAALAND, in her official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W. Washington DC 20240;<br><br>UNITED STATES BUREAU OF INDIAN AFFAIRS;<br><br>RICHARD MELVILLE, in his official capacity as DEPUTY BUREAU DIRECTOR, OFFICE OF JUSTICE SERVICES OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF INDIAN AFFAIRS;<br><br>JOHN BURGE, in his official capacity as SPECIAL AGENT IN CHARGE OF DISTRICT 1 OF THE UNITED STATES OFFICE OF JUSTICE SERVICES OF THE UNITED STATES DEPARTMENT OF THE INTERIOR AND in his official capacity as APPROVING OFFICIAL FOR THE UNITED STATES DEPARTMENT OF THE INTERIOR;<br><br>DARRYL LACOUNTE, in his official capacity as DIRECTOR, BUREAU OF INDIAN AFFAIRS, UNITED STATES DEPARTMENT OF THE INTERIOR;<br><br>And<br><br>GINA DOUVILLE, in her official capacity as SUPERINTENDENT OF INDIAN AFFAIRS OF THE UNITED STATES BUREAU OF INDIAN AFFAIRS, UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>Defendants. | Civil Action No. 24-cv- _5004_<br><br>**COMPLAINT** |

1

Comes now Plaintiff, OGLALA SIOUX TRIBE (hereinafter the "Tribe"), a federally recognized Indian tribe, by and through its undersigned counsel, and complains of the Defendants, and each of them, as follows:

## JURISDICTION AND VENUE

1.  The action arises out of the United States' failure to adhere to its treaty and trust responsibility to provide and adequately equip a sufficient number of law enforcement officers on the Pine Ridge Indian Reservation to reasonably ensure that the Defendants are providing for effective, timely, and diligent investigation of all violations of federal and Tribal law, and for the arrest and punishment of offenders, and for violations of the Indian Self-Determination and Education Assistance Act (hereinafter "ISDEAA"), 25 U.S.C. §§ 5301-5423, as stated herein.

2.  This Court has jurisdiction over the subject matter of this action pursuant to: (a) 28 U.S.C. § 1331 (federal question action), because this is a civil action arising under the Constitution, laws, or treaties of the United States; (b) 28 U.S.C. § 1362 (federal question action brought by an Indian tribe), because this is a civil action brought by an Indian tribe with a governing body duly recognized by the Secretary of the Interior (hereinafter "Secretary") and the matter in controversy arises under the Constitution, laws, or treaties of the United States; (c) 25 U.S.C. § 5331(a) (action under the ISDEAA), because this is a civil action against the Secretary arising under the ISDEAA; and (d) 28 U.S.C. § 1361 (mandamus against federal official), because this is an action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the Plaintiff.

3.  This action arises under the Constitution, laws, and treaties of the United States, as

hereinafter more fully appears, including but not limited to: the Commerce Clause, U.S. Const. Art. 1, § 8, cl. 3; the Treaty with the Sioune and Oglala Tribes, July 5, 1825, 7 Stat. 252 (hereinafter "1825 Treaty"); the Treaty of Fort Laramie with Sioux, Etc., Sept. 17, 1851, available at 2 Charles J. Kappler, *Indian Affairs: Law and Treaties*,  Senate, 58th Congress, 2nd session, S. Doc. No.719-194, at 594-596 (3d Sess. 1904), https://dc.library.okstate.edu/digital/collection/kapplers/id/29610 (last visited January 12, 2024) (hereinafter "1851 Treaty"); the Treaty with the Sioux—Brule, Oglala, Miniconjou, Yanktonai, Hunkpapa, Blackfeet, Cuthead, Two Kettle, Sans Arcs, and Santee—and Arapaho, Apr. 29, 1868, 15 Stat. 635 (hereinafter "1868 Treaty"); the Act of Feb. 28, 1877, ch. 72, 19  Stat. 254 (hereinafter "1877 Act"); the Snyder Act of Nov. 2, 1921, 25 U.S.C. § 13 (hereinafter "Snyder Act"); the ISDEAA, 25 U.S.C. §§ 5301-5423; the Indian Law Enforcement Reform Act (hereinafter "ILERA"), 25 U.S.C. §§ 2801-2815; the Tribal Law and Order Act of 2010 (hereinafter "TLOA"), Pub. L. No. 111-211, Title II, 124 Stat. 2258 (codified in scattered sections of 18 U.S.C., 21 U.S.C., 25 U.S.C., 28 U.S.C., 42 U.S.C.); the Administrative Procedure Act (hereinafter "APA"), 5 U.S.C. §§ 551-596 and §§ 701-706; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; and the federal common law.

4.      The United States has waived its sovereign immunity from suit in this action under 25 U.S.C. §§ 5321(b)(3), 5331(a) and (d) (incorporating the Contract Disputes Act, 41 U.S.C. § 7104) for civil actions against the Secretary arising under the ISDEAA for relief including money damages, injunctive relief, or mandamus.

5.      The United States has waived its sovereign immunity from suit in this action under 5 U.S.C. § 702.  Section 702 waives sovereign immunity for all claims for relief other than monetary

damages, including all forms of equitable relief, involving a federal official's action or failure to act.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1) because the Tribe and the Pine Ridge Indian Reservation are located within the District of South Dakota, the offices of Defendants John Burge and Gina Douville are located within this judicial district, the Department of the Interior is an agency of the United States, and a substantial part of the events or omissions giving rise to the claims herein occurred and are still occurring within this judicial district.

## PARTIES

7.     Plaintiff OGLALA SIOUX TRIBE (the "Tribe") is a federally recognized Indian tribe, recognized to have the immunities and privileges available to federally recognized Indian tribes by virtue of their government-to-government relationship with the United States as well as the responsibilities, powers, limitations, and obligations of such Indian tribes.  *See Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs*, 87 Fed. Reg. 4636, 4638 (Jan. 28, 2022).   The Tribe's governmental headquarters is located at 107 West Main Street, P.O. Box 2070, Pine Ridge, South Dakota 57770.  The Tribe is organized under a Constitution pursuant to § 16 of the Indian Reorganization Act of June 18, 1934, 25 U.S.C. § 5123 (formerly 25 U.S.C. § 476), with a governing body known as the Tribal Council.

8.     The Tribe is one of the bands of the Lakota and is both a part of and one of the successors in interest of the "Sioux Nation."  *See Sioux Tribe of Indians v. United States*, 14 Cl. Ct. 94, 95 n. 1 (1987), *aff'd*, 862 F.2d 275 (Fed. Cir. 1988).  The Oglala band is both a signatory of and a party to the 1825, 1851, and 1868 Treaties, and the Tribe and its

members are beneficiaries of the covenants contained therein.  The Tribe brings this action in its governmental capacity to protect its sovereign interests.  The Tribe, as beneficiary of the United States' duties under the 1825, 1851, and 1868 Treaties, the 1877 Act, the federal law enforcement statutes detailed herein, and as recipient and beneficiary of the federal law enforcement services and funding provided by Defendants and in dispute in this action, suffers its own injury from Defendants' actions complained of herein.  The threat to the health and safety of all Tribal members caused by Defendants' actions and failures to act complained of herein is a specific component of the Tribe's sovereign governmental interest.  The Tribe also brings this action as *parens patriae* on behalf of all of its Tribal members and raises claims that affect each of those members.  The Tribe has a quasi-sovereign interest in the disputes herein, apart from the interests of its Tribal members, and there is an injury to a substantial segment of the Tribe's population.

9.     Defendant the UNITED STATES OF AMERICA is a party to the 1825, 1851, and 1868 Treaties and is responsible for fulfilling the requirements of the statutes detailed herein.  It acts through and is responsible for the actions of its authorized agencies, officials, employees, and agents, including the other Defendant parties described below.

10.    Defendant DEB HAALAND is the Secretary of the Interior (hereinafter "Secretary").  The Secretary is responsible, *inter alia*, "for providing, or for assisting in the provision of, law enforcement services in Indian country . . .."  25 U.S.C. § 2802(a).  She is sued herein in her official capacity.

11.    Defendant UNITED STATES BUREAU OF INDIAN AFFAIRS (hereinafter "Bureau of Indian Affairs" or "BIA") is the federal agency through which the Secretary acts in fulfilling her Indian law enforcement responsibilities in Indian country and the federal

agency that contracts with the Oglala Sioux Tribe under the ISDEAA.

12. Defendant RICHARD MELVILLE is the Deputy Bureau Director of the Office of Justice Services (hereinafter "OJS") within the Bureau of Indian Affairs.  He is sued herein in his official capacity.  The OJS is responsible, "under the supervision of the Secretary, or an individual designated by the Secretary," for, *inter alia*, "carrying out the law enforcement functions of the Secretary in Indian country and implementing" related specified responsibilities under the ILERA.  25 U.S.C. § 2802(I)(e).  *See also* Dept. of Interior Manual, 130 DM 4.1 (2015).

13. Defendant JOHN BURGE is the Special Agent in Charge of District 1 of the OJS.  His position makes him responsible for overseeing all BIA-funded law enforcement services provided in the Great Plains Region of the United States, including law enforcement services on the Pine Ridge Indian Reservation.  He is also the Approving Official for the OJS.  In that role, he issued both of the agency's January 11, 2023 initial review letters to the Tribe as well as both of the agency's January 25, 2023 partial declination letters that are the subject of this Complaint.  He is sued herein in his official capacity.

14. Defendant DARRYL LACOUNTE is the Director of the BIA.  In this capacity, he "administers all laws governing the non-education portions of Indian Affairs and provides leadership and direction for the Bureau of Indian Affairs."  Dept. of Interior Manual, 130 DM 3.1.  He is responsible for the overall management of Defendant BIA and its activities, functions, programs, and services.  He is sued herein in his official capacity.

15. Defendant GINA DOUVILLE is the Superintendent of the Pine Ridge Agency of the Bureau of Indian Affairs.  She currently serves as the United States' Indian Agent at the Pine Ridge Agency.  She is sued herein in her official capacity.

## INTRODUCTION

16.   Plaintiff seeks to enforce the Defendants' duty and obligation to provide the Tribe with adequate funding sufficient for an effective law enforcement program pursuant to treaties, federal statutory and common law, and the United States' trust responsibilities to the Tribe.

17.   This is a duty and an obligation the United States undertook when it entered into and ratified the 1825, 1851, and 1868 Treaties with the Tribe and has acknowledged in relevant federal statutes, including the 1877 Act, the Snyder Act, the ISDEAA, the ILERA, and the TLOA.

18.   This obligation requires the United States government to provide sufficient resources to ensure the prompt and diligent reporting and investigation of all crimes, and the arrest and punishment of all offenders who violate federal law and (pursuant to federal statute) Tribal law, or otherwise threaten or harm the Tribe or its property, or the person or property of any Tribal member.   Such obligation to the Tribe specifically includes providing, or providing sufficient funding for, a sufficient number of law enforcement officers and criminal investigators within the boundaries of the Tribe's territory, the Pine Ridge Indian Reservation (hereinafter "Pine Ridge Reservation" or "Reservation"), to assure that the level and overall effectiveness of those services is in compliance with its treaty and trust responsibilities.

19.   These law enforcement activities are not a discretionary federal program that the Defendants can choose to operate or not operate or choose to operate at a minimal level. They are instead a treaty and trust obligation, the primary responsibility for which has been assigned to the Secretary.

20.   Defendants are failing to meet this obligation, not because the Congress has failed to enact

the requisite statutes for them to do so, but because Defendants fail to treat law enforcement as a treaty and trust obligation rather than a discretionary function or program that they can choose to perform or not perform.  As a result, there is a lack of adequate and effective law enforcement within the Tribe's Reservation, and the impacts have been and continue to be catastrophic.

21.     The Tribe seeks declaratory and injunctive relief that requires Defendants to provide law enforcement resources sufficient to comply with the obligations to the Tribe that the United States undertook in the Treaties and charged Defendant officials with the duty to perform in relevant federal statutes.

## GENERAL ALLEGATIONS

### I.   The Law Enforcement Obligations to the Tribe Undertaken by the United States in the 1825 Treaty and the Fort Laramie Treaties of 1851 and 1868

22.     Since its earliest days, the United States Supreme Court has consistently recognized the special duty the federal government assumed in treaties with federally recognized Indian tribes.  *See, e.g.*, *Worcester v. Georgia*, 31 U.S. 515, 556-57 (1832).

23.     Seeking to secure peace with the tribes and to ensure safe federally controlled trade in the area, on July 5, 1825, the United States, pursuant to its constitutional authority, entered into the 1825 Treaty with the Sioune and Oglala Tribes.  Treaty with the Sioune and Oglala Tribes, July 5, 1825, 7 Stat. 252 (hereinafter "1825 Treaty").

24.     Pursuant to that 1825 Treaty, the Sioune and Ogallala bands formally acknowledged "that they reside within the territorial limits of the United States, acknowledge their supremacy, and claim their protection[,]" and the United States agreed to receive them "into their friendship, and under their protection[.]" Id. at arts. 1 and 2.

25.     In exchange for its right to license and regulate traders in the region, the United States

8

further pledged "[t]hat the friendship, which is now established between the United States and the Sioune and Ogallala bands should not be interrupted by the misconduct of individuals . . .." *Id*. at art. 5.

26.   More specifically, in exchange for the Tribe's voluntary relinquishment of its sovereign right to seek retribution again non-members who violated the law, and the promise of the federal protection the Tribe was to receive, the parties reached the following agreement:

> it is hereby agreed, that for injuries done by individuals, no private revenge or retaliation shall take place, but instead thereof, **complaints shall be made, by the injured party, to the superintendent or agent of Indian affairs**, or other person appointed by the President; and it shall be the duty of the Chiefs, upon complaint being made as aforesaid, **to deliver up the person or persons**, against whom the complaint is made, to the end that he or they may be **punished agreeably to the laws of the United States**. And, in like manner, if any robbery, violence or murder, shall be committed on any Indian or Indians belonging to the said bands, **the person or persons so offending shall be tried, and if found guilty shall be punished** in like manner as if the injury had been done to a white man.

*Id*. (emphasis added).

27.   That 1825 Treaty was one of the earliest federal commitments to impose U.S. criminal law in Oglala territory, and to provide basic federal law enforcement services in Oglala territory.

28.   The 1825 Treaty also for the first time formally established the legal relationship between the Oglala Tribe and the United States. The "claim" by the Oglala band to the "protection" of the United States and the reciprocal agreement by the United States "to receive [the Oglala band] into their friendship, and under their protection" created a well-understood "protectorate" relationship between the United States and the Oglala Tribe. *Id.* at arts. 1 and 2. *See, e.g.*, *Worcester*, 31 U.S. at 551-555, 560-561. *See generally* Seth Davis, Eric Biber & Elena Kempf, *Persisting Sovereignties*, 170 U. Pa. L. Rev. 549, esp. 624-625

(2022); Matthew L.M. Fletcher, *The Dark Matter of Federal Indian Law: The Duty of Protection*, 75 Me. L. Rev. 306 (2023).

29.    The United States understood and agreed that by virtue of this protectorate relationship, its obligations as the protector owed to the protected Tribe included not only a protected trade relationship, but "of still more importance, [that] the strong hand of government [be] interposed to restrain the disorderly and licentious from intrusions into their country, from encroachments on their lands, and from those acts of violence which were often attended by reciprocal murder." *Worcester*, 31 U.S. at 552.  *See also id.* at 555 ("The Indian nations were . . . necessarily dependent on [first Great Britain and thereafter the United States] for their protection from lawless and injurious intrusions into their country.").

30.    Following the signing of the 1825 Treaty, more non-Indians moved into the area.  Kerry R. Oman, *The Beginning of the End; The Indian Peace Commission of 1867-1868*, 22 Great Plains Q. 35, 35-36 (2002).

31.    Later, the Oglala voluntarily agreed, in the 1851 Treaty, to allow the United States the right to establish roads and military and other outposts in certain locations in their aboriginal territory.  The Treaty of Fort Laramie with Sioux, Etc., Sept. 17, 1851, Art. 2, available at 2 Charles J. Kappler, *Indian Affairs: Law and Treaties*, Senate, 58th Congress, 2nd session, S. Doc. No.719-194, at 594-596 (3d Sess. 1904), https://dc.library.okstate.edu/digital/collection/kapplers/id/29610 (last visited January 12, 2024) (hereinafter "1851 Treaty").  They did this in exchange for, among other things, the United States binding itself to protect Oglala Tribal members from "the commission of all depredations by the people of the said United States[.]" Id. art. 3.  This was the second promise of federal law enforcement protections that the Oglala received.

32.     By the 1860s, in part because the federal troops who were supposed to be policing the Tribe's territory had been called away to fight in the Civil War, a series of major confrontations had arisen between the tribes, including Oglala, and non-Indians, which federal studies later concluded were largely due to the "aggression of lawless white men" and insufficient federal enforcement.  Oman, *supra*, at 36.

33.     One of the major federal concerns at the time centered around the aggressive Sioux attacks on non-Indians who were traveling along the Bozeman Trail.  *Id.* at 36-41.  The U.S. and Sioux military actions that followed those attacks are commonly referred to by historians as the Powder River War.

34.     Given the federal government's western expansion goals, by 1867 Congress had concluded that it was more cost effective to enter into additional treaties with certain tribes, including the Oglala band, than it was to continue to attempt to control them by military force.  *Id.* Thus, when the United States asked the Oglala to come to Fort Laramie in the spring of 1868, it had very specific goals: (1) to bring an end to the Powder River War; (2) to stop violent Sioux retaliation against persons who threatened their people or property or otherwise committed criminal acts; (3) to set the boundaries of what is now commonly known as the "Great Sioux Reservation" and encourage the Sioux to move there; and (4) to promote peace between the parties.  *Id.* at 37.

35.     The 1868 Treaty that the United States proposed and later ratified not only renewed the promises the United States had made in the 1825 and 1851 Treaties, but it also expressly articulated the federal government's commitments to provide the Oglala with some very specific law enforcement protections.  Treaty with the Sioux—Brule, Oglala, Miniconjou,

Yanktonai, Hunkpapa, Blackfeet, Cuthead, Two Kettle, Sans Arcs, and Santee—and

Arapaho, Apr. 29, 1868, 15 Stat. 635 (hereinafter "1868 Treaty").

36.    Article I of that 1868 Treaty includes two provisions commonly referred to as the "bad

men" clauses.  The "bad men" clauses are key to understanding the specific manner by

which the federal government's broad duty under the 1825 and 1851 Treaties to provide

effective law enforcement to the Tribe is to be implemented; thus, they are set out at length

as follows:

> If bad men among the whites, or among other people subject to the authority
> of the United States, shall commit any wrong upon the person or property
> of the Indians, the United States will, upon proof made to the agent and
> forwarded to the Commissioner of Indian Affairs at Washington City,
> proceed at once **to cause the offender to be arrested and punished
> according to the laws of the United States**, and also re-imburse the injured
> person for the loss sustained.[1]

[And,]

> If bad men among the Indians shall commit a wrong or depredation upon
> the person or property of any one, white, black, or Indian, subject to the
> authority of the United States, and at peace therewith, the Indians named
> solemnly agree that they will, upon proof made to their agent and notice by
> him, deliver up the wrong-doer to the United States, **to be tried and
> punished according to its laws**; and in case they willfully refuse so to do,
> the person injured shall be re-imbursed for his loss from the annuities or
> other moneys due or to become due to them under this or other treaties made
> with the United States.   And the President, on advising with the
> Commissioner of Indian Affairs, shall prescribe such rules and regulations
> for ascertaining damages under the provisions of this article as in his
> judgment may be proper.  But no one sustaining loss while violating the
> provisions of this treaty or the laws of the United States shall be reimbursed
> therefor.

*Id.* at art. I (emphasis added).

37.    Article V of the 1868 Treaty states as follows:

> The United States agrees that the agent for said Indians shall in the future

---

[1] This role of the Commissioner of Indian Affairs is now delegated by statute to the OJS and the
United States Attorney.  25 U.S.C. § 2802.

make his home at the agency-building; that he shall reside among them, and keep an office open at all times for the purpose of **prompt and diligent inquiry** into such matters of complaint by and against the Indians **as may be presented for investigation under the provisions of their treaty stipulations**, as also for the faithful discharge of other duties enjoined on him by law.  In all cases of depredation on person or property he shall cause the evidence to be taken in writing and forwarded, together with his findings, to the Commissioner of Indian Affairs, whose decision, subject to the revision of the Secretary of the Interior, shall be binding on the parties to this treaty.

*Id.* at art. V.

38.    The protections promised by these provisions were of the utmost importance to the Tribe, and it is only logical to conclude that the still militarily powerful Oglala Sioux Tribe would not have agreed to the Treaty's provisions unless it felt assured that its people, its property, and its territory were now going to be policed by the United States effectively in compliance with its treaty obligations.

39.    This treaty language was understood by the Tribe as requiring that "bad men" would "be arrested and punished" and that "prompt and diligent inquiry [would be made] into such matters of complaint by and against the Indians as may be presented for investigation . . .." 1868 Treaty, arts. I and V.  *See also Cheyenne River Sioux Tribe v. Jewell*, 205 F. Supp. 3d 1052, 1063 (D.S.D. 2016) (quoting *Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 676 (1979)) (a treaty "must 'be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians'").  There was no language in the Treaty, and no language in the Treaty negotiations, that suggested that the federal government was going to be allowed to decide when and if it wanted to engage in these activities, or to limit these responsibilities based upon its unilateral decision as to how it wanted to spend its federal dollars.  *See Cheyenne River Sioux Tribe*, 205 F. Supp. 3d at 1063 (quoting *Minnesota v.*

*Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196 (1999)) ("The Indian canons of construction also require courts to 'look beyond the written words to the larger context that frames the Treaty, including "the history of the treaty, the negotiations, and the practical construction adopted by the parties."'") (internal citations omitted).

40.     Unlike education or health care, which can be procured from other private sources, law enforcement activities have to be performed as a governmental function, by a governmental entity with jurisdiction.

41.     The 1868 Treaty was ratified by the Senate on February 16, 1869 and was then proclaimed by President Andrew Johnson on February 24, 1869.  15 Stat. 635 (1869).

## II.     Congressional Reaffirmation and Implementation of the United States' Law Enforcement Treaty Obligations in 1877 and in Subsequent Appropriations

42.     Through the Treaties listed above, the federal government has undertaken an exclusive and specific trust responsibility to ensure effective public safety to Indians.  *See* Cohen's Handbook of Federal Indian Law § 22.07[1][a] (Nell Jessup Newton ed.) (2012 ed. & Supp. 2017).  Through legislation, the federal government has recognized and reinforced this duty.

43.     On February 28, 1877, the Forty-Fourth Congress unilaterally enacted a statute to reaffirm the "agreement with certain bands of the Sioux Nation of Indians . . .."  *See* Act of February 28, 1877, ch. 72, 19 Stat. 254 (hereinafter "1877 Act").  The purpose of the 1877 Act, in part, was to reaffirm the provisions made in the 1868 Treaty, including the Article I "bad men" clauses and the Article V provision providing a federal agent responsible for investigating complaints by and against Tribal members.  Thus, through the passage of the 1877 Act, the federal government reaffirmed its obligation to provide effective law enforcement services to the Tribe on the Reservation.

14

44.   Along with confirming promises already made, Congress also unilaterally added further commitments as follows:

> The provisions of the said treaty of 1868 . . . shall continue in full force, and, with the provisions of this agreement, shall apply to any country which may hereafter be occupied by the said Indians as a home; and **Congress shall, by appropriate legislation, secure to them an orderly government; they shall be subject to the laws of the United States, and each individual shall be protected in his rights of property, person, and life**.

1877 Act, art. 8 (emphasis added).

45.   To begin to fulfill these commitments, in 1878, Congress began appropriating specific federal funds for federal Indian law enforcement in the Western tribal areas of the United States, including at the Pine Ridge Reservation.  Act of May 27, 1878, ch. 142, 20 Stat. 63. Within the next few years, Congress began regularly appropriating such funds.  *See* Act of May 11, 1880, ch. 85, 21 Stat. 114.   This appropriation of funds shows the federal government's recognition of, and intent to uphold their duties under the 1825, 1851, and 1868 Treaties.

46.   By the end of 1879, the federal Indian Agent at the Pine Ridge Agency had organized, deputized, and began equipping and paying a federal Oglala Sioux Tribal Police Force of over 50 men.  Mark R. Ellis, *Reservation Akicitas: The Pine Ridge Indian Police, 1879-1885*, 29 S.D. Hist. 185, 187 (1999).  This further confirmed the federal government's commitment to provide adequate on-reservation law and order services to the Oglala Tribe on the Pine Ridge Reservation.

47.   As noted above, federal law enforcement efforts expanded post-Treaty.  By the fall of 1878, "six agencies comprised the [Great Sioux Reservation]: Cheyenne River, Pine Ridge, Rosebud, Standing Rock, Crow Creek, and Lower Brulé[.] . . .   All the problems

15

encountered at other agencies seemed to be compounded here." WILLIAM T. HAGAN, INDIAN POLICE AND JUDGES 82 (U Neb. Press. 1980). "There were more Indians, more room for them to roam, more opposition to the civilization programs, and, along the Nebraska line and at the landings on the Missouri River, more whites to interfere." *Id.*

48.   This is reinforced in an 1879 report to the Commissioner of Indian Affairs, written by Federal Agent McGillycuddy, the federal Indian Agent at the Pine Ridge Agency.  In that report, he justified the more than fifty (50) federal Indian Police that he was employing at the Pine Ridge Agency in 1879 by noting that just over the Nebraska state line was a large settlement that he "believed to be a 'rendezvous for criminals and outlaws of all kinds[,]'" and he wanted to "keep the reservation free of such undesirable elements[.]" *Id.* at 90-91.

49.   In a related report, McGillycuddy also noted that he was further concerned about Indian versus Indian conflict, noting specifically his concerns about potential local trouble from "Red Cloud, the principal chief at Rosebud." *Id.* at 91. Red Cloud, along with his warriors, had successfully closed the Bozeman Trail in the 1860s, and they were resisting federal efforts on the Pine Ridge Reservation. *Id.* For those reasons, Professor Hagan concluded that "McGillycuddy's fifty-man force [at Pine Ridge] was absolutely indispensable in administering the 4,000 square miles inhabited by 8,000 Indians." *Id.*

50.   By 1880, the Commissioner of Indian Affairs reported the broad scope of Indian Police authority over reservation law and order, stating in part:

> The practicability of employing an Indian police to maintain order upon an Indian reservation is no longer a matter of question.  In less than three years the system has been put in operation at 40 agencies, and the total force now numbers 162 officers and 653 privates.
> . . .
>
> [A]t all agencies Indian policemen act as guards at annuity payments; render assistance and preserve order during ration issues; protect agency buildings

16

and property; return truant pupils to school; search for and return lost or stolen property, whether belonging to Indians or white men; prevent depredations on timber, and the introduction of whisky on the reservation; bring whisky sellers to trial; make arrests for disorderly conduct, drunkenness, wife-beating, theft, and other offenses; serve as couriers and messengers; keep the agent informed as to births and deaths in the tribe, and notify him promptly as to the coming on the reserve of any strangers, white or Indian.  Vigilant and observant by nature, and familiar with every foot-path on the reservation, no arrivals or de-partures, or clandestine councils can escape their notice, and with a well disciplined police-force an agent can keep himself informed as to every noteworthy occurrence taking place within the entire limit of his juris-diction.

1880 Ann. Rep. of the Comm'r of Indian Affs. to the Sec'y of the Interior, 1880 at IX-X, located at *Oglala Sioux Tribe v. United States*, No.*5:22-cv-05066-RAL*, Doc. 73-4.

51.     The federal government further expanded this federal authority in 1885 with the passage of the Major Crimes Act (hereinafter "MCA"), 18 U.S.C. § 1153.  The MCA expanded federal jurisdiction over Indians who commit crimes against other Indians within Indian Country.  *Id.*

52.     In upholding the MCA, the United States Supreme Court recognized the federal government's "duty of protection" that arose from the treaties.  *United States v. Kagama,* 118 U.S. 375, 384 (1886).  The Court noted that the duty of protection "has always been recognized by the executive, and by congress, and by this court, whenever the question has arisen."  *Id.  See also Oglala Sioux Tribe v. United States*, No. 5:22-cv-05066-RAL, Opinion and Order Denying Defendant's Motion to Dismiss and Ruling Upon Plaintiff's Motion for Preliminary Injunction, Doc. 78 at 60, 77 (May 23, 2023).

53.     After awarding reoccurring appropriations for federal law enforcement at the Pine Ridge Reservation for over 42 years, in the 1921 Snyder Act Congress provided the ongoing authorization and mandate for the BIA, under the Secretary's supervision, to "direct,

supervise, and expend . . . for the benefit, care, and assistance of the Indians . . ..."  25 U.S.C. § 13.

54.    One of the purposes expressly set forth in the Snyder Act is to provide funds for the employment of "Indian police[.]" Id.  From the Snyder Act's enactment forward, Congress has directed the Secretary to use funding appropriated by Congress to pay for "Indian police[.]" Id.

### III.    Congressional Reaffirmation and Implementation of Law Enforcement Treaty Obligations in the Modern Era through Enactment of the ILERA, the TLOA, and the ISDEAA.

### A.    The Indian Law Enforcement Reform Act (hereinafter "ILERA")

55.    Following the Congressional "Indian police" directive in the 1921 Snyder Act, the ILERA, Pub. L. No. 101-379, Aug. 18, 1990, 104 Stat. 473 (codified as amended at 25 U.S.C. §§ 2801-2815), provided that the Secretary, acting through the BIA, "shall be responsible for providing, or for assisting in the provision of, law enforcement services in Indian country . . . ."  25 U.S.C. § 2802(a).  This, along with the Oglala Treaties, distinguishes law enforcement from other federally created programs, and made law enforcement an obligation of the Secretary and the BIA.

56.    The ILERA created a specific division within the BIA called the Office of Justice Services (hereinafter "OJS"), which it stated "shall be responsible for . . . carrying out the law enforcement functions of the Secretary in Indian country[.]" 25 U.S.C. § 2802(b)(1).

57.    The ILERA also articulates in even more specific terms what competence means in the context of the federal government's preexisting law enforcement duties and responsibilities owed to the Tribe.  For example, in ILERA, Congress authorized OJS to adopt a Bureau of Indian Affairs Office of Justice Services Law Enforcement Handbook (hereinafter the

"Handbook").   25 U.S.C. § 2802(c)(9).   The adopted Handbook establishes a comprehensive list of standards that all tribal law enforcement programs must meet, many of which are today unfunded mandates on the Pine Ridge Reservation.  It even states what items can and cannot be included in law enforcement agreements between the Tribe and local government units.  *See* Bureau of Indian Affairs Office of Justice Services Law Enforcement Handbook (3rd ed. 2015), available at Bureau of Indian Affs., Off. Just. Servs., *Law Enforcement Handbook* (3d ed. 2015), available at https://www.bia.gov/sites/default/files/dup/BIA%20OJS%20Third%20Edition%20LE%20Handbook%202015%20_%20Approved%20Public%20Release%283%29.pdf    (last visited Jan. 11, 2024).  Adherence to the Handbook, or its minimum standards, is a condition for the Tribe's receipt of any federal law enforcement funding.  25 C.F.R. §§ 12.11, 12.14.

58.    In addition, 25 C.F.R. § 12.12 sets forth both a requirement that law enforcement programs contracted by tribes meet minimum standards required and an obligation on the Department of Interior "to ensure compliance with minimum federal standards" and to ensure "a professional law enforcement program . . .."  25 C.F.R. § 12.12.

59.    Furthermore, the ILERA states that the OJS is responsible for:

(1) the enforcement of Federal law **and, with the consent of the Indian tribe, tribal law**;

(2) in cooperation with appropriate Federal and tribal law enforcement agencies, the investigation of offenses against criminal laws of the United States; [and]

(3) the protection of life and property[.]

19

25 U.S.C. § 2802(c) (emphasis added).

**B.      The Tribal Law and Order Act of 2010 (hereinafter "TLOA")**

60.   In 2010, Congress again reinforced the federal government's preexisting law enforcement duty to the Tribe when it enacted the TLOA, Pub. L. No. 111-211, Title II, July 29, 2010, 124 Stat. 2258 (codified as amended in scattered sections of 18 U.S.C., 21 U.S.C., 25 U.S.C., 28 U.S.C., 42 U.S.C.).  In its findings, Congress acknowledged that "[t]he United States has distinct legal, treaty, and trust obligations to provide for the public safety of Indian country[.]" TLOA, § 202(a)(1).

61.   Officials of the DOI and BIA have stated that law enforcement funding is a trust and treaty responsibility.  Declaration of Cora White Horse (hereinafter "White Horse Decl.") at ¶¶ 40-41.

62.   In 2006, the BIA conducted a Gap Analysis, the purpose of which was to compare current law enforcement staffing "against a standard or benchmark, such as industry best practices, organizational strategic goals, or standards applied by federal regulation."   "U.S. Department of the Interior, Bureau of Indian Affairs, Office of Law Enforcement Services Gap Analysis April 18, 2006" (hereinafter "Gap Analysis") at 1, a true and correct copy of which is attached hereto as Exhibit 1 to Complaint.  The Gap Analysis concludes that 3.3 officers per 1,000 inhabitants of rural areas under 10,000 inhabitants is the minimum required to meet federal law enforcement obligations.  *Id.* at 3.

63.   Congress stated that three of the primary purposes of the TLOA were "to empower tribal governments with the authority, resources, and information necessary to safely and effectively provide public safety in Indian country; . . . to reduce the prevalence of violent crime in Indian country and to combat sexual and domestic violence against American

Indian and Alaska Native women; [and] to prevent drug trafficking and reduce rates of alcohol and drug addiction in Indian country[.]"  TLOA, § 202(b)(3).

64.    TLOA requires the BIA to report annually to Congress on the unmet needs of law enforcement in Indian Country.  TLOA § 211(b)(16)(C), 25 U.S.C. § 2802(c)(16)(C).  This in turn requires the BIA to determine what the minimum "need" is to provide "basic" law enforcement.  In fact, the BIA's 2011-2020 TLOA-mandated reports to Congress actually each contain statements defining that "need" for a "basic program" as 2.8 officers per 1,000 persons. "Report to the Congress on Spending, Staffing, and Estimated Funding Costs for Public Safety and Justice Programs in Indian Country, 2020" (hereinafter "2020 OJS TLOA Report") at 5, a true and correct copy of which is attached hereto as Exhibit 2 to the Complaint.  The last TLOA Report to Congress that OJS filed, as required by 25 U.S.C. § 2802(c)(16)(C), was for FY 2020.  *See* Ex. 2.

65.    The 2.8 officers per 1,000 service population standard was based upon the BIA's adoption of the U.S. Department of Justice's Uniform Crime Data collected from comparable rural areas of 10,000 or less (which, unlike the Tribe, do not have excessive crime or excessive distance between police calls) and is inexplicably lower than the Gap Analysis' conclusion that 3.3 officers per 1,000 is the minimum required.  Ex. 1 at 3.

66.    On November 8, 2023, during a Technical Assistance meeting between Defendants and the Tribe, which was held to fulfill Defendants' obligations pursuant to the District of South Dakota Court's Order on the Tribe's Motion for a Preliminary Injunction in *Oglala Sioux Tribe v. United States*, No.  22-cv-05066-RAL (May 23, 2023), OJS confirmed that the 2.8 per 1,000 persons standard is in fact the standard OJS uses to determine a tribe's need for funding.  Declaration of Rebecca Kidder (hereinafter "Kidder Decl.") Ex. 1, "Transcript of

'OST v. U.S. – All Parties Meeting'" (Nov. 8, 2023), at 61:10-23.

C.     **The Indian Self-Determination and Educational Assistance Act (hereinafter "ISDEAA")**

67.    The ISDEAA, Pub. L. No. 93-638, Title I, Jan. 4, 1975, 88 Stat. 2203 (codified as amended at 25 U.S.C. §§ 5301-5423), authorizes the federal government and Indian tribes to enter into contracts in which the tribes supply federally funded services, including law enforcement services, that a federal government agency would otherwise provide.  *See* 25 U.S.C. §§ 5302(b), 5321(a).   In enacting the ISDEAA, Congress "recognize[d] the obligation of the United States to respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction of educational as well as other Federal services to Indian communities so as to render such services more responsive to the needs and desires of those communities."  *Id.* § 5302(a).

68.    Congress further "declare[d] its commitment to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services."  *Id*. § 5302(b).

69.    Section 106 of the ISDEAA, 25 U.S.C. § 5325(a)(1), provides that "[t]he amount of funds provided under the terms of self-determination contracts . . . shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract . . . ."  The amount of funds that the "Secretary would have otherwise provided" for adequate law enforcement is no less than

22

the amount that the Secretary is required to expend under the Tribe's Treaties, the ILERA, and TLOA.

70.    Section 102 of the ISDEAA, 25 U.S.C. § 5321(a)(2), imposes explicit requirements.  The Secretary is *directed* to enter into the proposed contract unless, upon review, the Secretary's objection to the proposal falls within one of only five statutory reasons allowed for declination.  The law requires the following Secretarial action: "[t]he Secretary shall, within ninety days after receipt of the [tribe's] proposal, approve the proposal and award the contract unless the Secretary provides written notification to the applicant that contains a specific finding that clearly demonstrates that, or that is supported by controlling legal authority that" one of the five statutorily permitted reasons for declination exists.  25 U.S.C. § 5321(a)(2).

71.    The implementing regulations at 25 C.F.R. § 900.29(a) require that the Secretary's finding must be accompanied by "a detailed explanation of the reason" why one or more of the declination criteria exists and the "documents relied on in making the decision[.]"

72.    Section 102 of the ISDEAA and the implementing regulations at 25 C.F.R. § 900.18 are specific about the consequences for the Secretary not complying with the statutory declination requirements within 90 days of receipt of a tribal proposal.  The consequences are that the Secretary is required, as a matter of law, to: (1) approve the Tribe's proposed contracts and approve the Tribe's proposed Annual Funding Agreements (hereinafter "AFAs"); (2) award the amended contracts and the new AFAs as proposed; and (3) add to the contract the full amounts of Title I funds pursuant to § 106(a)(1) of the ISDEAA (the amount the Secretary would have spent to comply with the federal government's treaty and trust responsibilities).  25 U.S.C. § 5321(a)(2).

73.    Each provision of ISDEAA (and other federal statutes involving Indians) shall be liberally construed for the benefit of the Tribe.  *See* 25 U.S.C. § 5321(g).

**IV.    Law Enforcement on the Pine Ridge Reservation and the Consequences of the Defendant's Failures**

74.    At roughly 3.1 million acres, the Oglala Sioux Tribe's Pine Ridge Reservation is larger than the states of Rhode Island and Delaware combined.

75.    More than 40,000 people reside on or conduct business on the Reservation, all of whom are dependent on federally funded Tribal law enforcement officers to protect them and their on-reservation property.   White Horse Decl. at ¶¶ 7-8; Declaration of Algin Young (hereinafter "Young Decl.") at ¶¶ 7-8.   Among these are Oglala Sioux Tribal members, non-member Indians, and non-Indians who reside on or enter the Reservation on a regular basis.  White Horse Decl. at ¶ 8.  These individuals comprise the law-enforcement service population of the Reservation.  Young Decl. at ¶ 8.

76.    Many crimes on the Reservation involve both an Oglala Sioux Tribal member and a non-member Indian or non-Indian.  Young Decl. at ¶ 9.  Yet Defendants have failed to include non-member Indians and non-Indians in calculating the Tribe's law enforcement service population and instead chose, through 2022, to arbitrarily to count only the Tribe's on-reservation enrolled members from the 2013 BIA Labor Force Report.  Ex. 2 at 4; White Horse Decl. at ¶ 14.

77.    On November 8, 2023, Defendant OJS reported to the Tribe that as of 2023, OJS is now using total Tribal enrollment, as of 2021, as a tribe's service population but admitted that the total enrollment of a tribe does not equate to the actual number of people served by law enforcement on a reservation.  Kidder Decl. Ex. 1 at 67:12-23; White Horse Decl. at ¶ 13. Under OJS's current method of calculating a tribe's law enforcement service population, a

tribe could have 1 million enrolled members, but only 200,000 people actually served by law enforcement, and it would still receive law enforcement funding to serve 1 million people.  Kidder Decl. Ex. 1 at 67:12-23.

78.   At some point during FY 2023, Defendant OJS started using 2021 tribal enrollment data in its funding formula for TLOA and ILERA funding to the Tribe and used a Tribal enrollment number of 45,697 for the Oglala Sioux Tribe.  *Id.* at 54:9-16; White Horse Decl. at ¶ 15.  The Tribal enrollment of the Oglala Sioux Tribe as of February 14, 2023, was 51,460 members, which has grown to 52,336 members as of December 28, 2023. Declaration of President Frank Star Comes Out (hereinafter "Star Comes Out Decl.") Ex. 1, "February 14, 2023 OST Tribal Enrollment Report"; Star Comes Out Decl. Ex. 2, "December 28, 2023 OST Tribal Enrollment Report."

79.   The Defendants' decision to base service population on tribal enrollment likewise fails to include the actual service population by failing to include non-member Indians, non-Indian residents of the Pine Ridge Reservation and those who work on and enter the Reservation, and now includes Tribal members who do not live on the Reservation or even visit the Reservation.  The use of tribal enrollment data results in some of the 196 tribes served by OJS law enforcement services being drastically overfunded because many tribes' enrollment significantly exceeds the number of persons who work or live on the reservation, which reduces the funds available for the Tribe.  White Horse Decl. at ¶ 13. *See also* Kidder Decl. Ex. 1 at 55:1-17; 65:15-68:11.

80.   This decision by Defendants is inconsistent with the existing law enforcement obligations of the Defendants and, through the ISDEAA, the Tribe, because the Tribe has, for example, criminal jurisdiction over non-member Indians under the Indian Civil Rights Act, 25

U.S.C. § 1301; can exercise civil jurisdiction over non-Indians who engage in consensual relationships with the Tribe as recognized in *Montana v. United States*, 450 U.S. 544, 565-66 (1981); can exercise the stop and search jurisdiction detailed in *United States v. Cooley*, 593 U.S. 345, 348 (2021), and other tribal jurisdictional cases; and can exercise expanded criminal jurisdiction over non-Indians in many cases of domestic violence pursuant to the Violence Against Women Act,  Pub. L. No. 113-4, Mar. 7, 2013, 127 Stat. 54 (2013).  It is also inconsistent with the fact that many tribal officers, who possess Special Law Enforcement Commissions, are specifically charged with exercising many forms of both tribal and federal criminal jurisdiction over both Indians and non-Indians in Indian country.

81.     The BIA's own standard of providing 2.8 officers per 1,000 people in the service population is the minimum required by the United States to provide the Tribe with adequate and effective law enforcement pursuant to the 1825, 1851, and 1868 Treaties and the duty of competence owed to the Tribe as carried forward from the Treaties in both the ILERA and the TLOA.

82.     Even this 2.8 officers per 1,000 persons in the service population in the BIA calculation is flawed due to the excessive size of the Reservation, the distance between Tribal on-reservation communities, the level of crime on the Reservation, and to the fact that the base contract was based on a dated 2013 Indian Population and Labor Force count that is no longer accurate.  Ex. 2 at 4.  This count is not only ten years old, but it also fails to include any of the non-member Indian and non-Indian residents, or Tribal member and non-tribal member workers who live off the Reservation but work on the Reservation.  It further fails to include visitors and businesspersons coming onto the Reservation to provide goods and

26

services.  All of these individuals also rely upon the OJS contracted Tribal law enforcement services.  Young Decl. at ¶ 7.

83.    Applying the BIA's 2.8 officers per 1,000 persons standard to the actual Pine Ridge service population requires that the Tribe, with a law enforcement service population of over 40,000 individuals, have a minimum of 112 police officers.

84.    The United States currently only provides enough funding to employ 33 police officers and 8 criminal investigators to cover the over 40,000-person law-enforcement service population.  This is less than .9 officers per 1,000 persons in the service population.  Young Decl. at ¶¶ 14-15.

85.    This equates to only 6-8 officers per shift.  Young Decl. at ¶ 14.   The lack of law enforcement officers causes extraordinary danger to the law enforcement officers who are working unreasonable amounts of overtime, patrolling alone, and responding to dangerous calls for service without proper backup.  Young Decl. at ¶ 17.

86.    The lack of adequate law enforcement has had, and is continuing to have, serious consequences for the Tribe and its citizens, including but not limited to:

   A. In FY 2023 (October 1, 2022, to September 30, 2023), there were 165,799 calls to OST DPS seeking law enforcement assistance on the Pine Ridge Reservation. Young Decl. at ¶¶ 18-19; Young Decl. Ex. 1, "FY 2023 Service Calls Statistics Chart."  These included 1,133 calls involving an assault, 1,245 domestic violence calls, 589 gun-related calls, 343 drug/narcotic calls, and 339 child abuse/neglect calls, most of which required immediate attention to protect life, health, and safety. Young Decl. at ¶ 20; Young Decl. Ex. 1.  In addition to dispatch fielding a record number of gun-related calls, officers confiscated 133 rifles and handguns.  Young

Decl. at ¶¶ 21, 22.  Dispatch recorded 653 calls for missing persons, also a record number.   Young Decl. at ¶ 44; Young Decl. Ex. 5, "OST DPS FY23 Missing Person/ATL/Runaway Statistics."

B.  Many calls for police service are abandoned, are not being responded to in the time required to ensure public safety or are not being properly investigated or prosecuted because there simply are not enough police officers.  Young Decl. at ¶¶ 23-25.

C.  The volume of calls, combined with an inadequate number of police officers, is forcing police officers to drive from call to call at high speeds, endangering both the officers and the public.  Young Decl. at ¶ 26.

D.  Police response time often exceeds 30 minutes, even in cases of domestic violence, gun activities, and other imminent threats of harm.  Young Decl. at ¶ 27.  Some calls can take over an hour to arrive on scene in the communities that are distant from the limited law enforcement stations.  Young Decl. at ¶ 28.  This can and often does add to the harm suffered by crime victims on the Reservation.  Young Decl. at ¶ 27.

E.  Police officers operate alone, with backup often being over 30 miles away, even in calls involving guns or weapons.   Thus, police officers are often placed in unnecessary danger.  Young Decl. at ¶ 29.

F.  Crimes are not timely or adequately investigated, and witness statements and other evidence are not collected promptly, thereby endangering federal and Tribal prosecutions and convictions.  Young Decl. at ¶¶ 24- 25.

G.  On-reservation deaths, homicides, drug sales, police-involved accidents, and overdoses have increased significantly since 1999.  Young Decl. at ¶ 31.

H.  Law enforcement officers and criminal investigators are being called to work an unreasonable amount of overtime and work multiple shifts, with inadequate sleep or downtime.  This, too, is endangering both the officers and the public.  Young Decl. at ¶ 30.

87.  Tribal citizens are often scared to venture out of their homes at night, especially because gunshots are heard throughout the Reservation on a frequent and reoccurring basis.  Young Decl. at ¶ 33.

88.  As a result of the lack of adequate law enforcement, on November 18, 2023, Tribal President Frank Star Comes Out issued a Proclamation declaring a State of Emergency on the Reservation.  Star Comes Out Decl. Ex. 3, "OST President Star Comes Out's November 18, 2023 State of Emergency Proclamation."

89.  The Tribe itself is negatively impacted by the lack of law enforcement services.  Negative impacts include, but are not limited to:

A.  The Tribe operates many schools, health facilities, programs, and businesses on the Reservation.  There are also many private businesses located on the Reservation.  The lack of law enforcement compromises their safe operation.  White Horse Decl. at ¶ 18; Star Comes Out Decl. at ¶ 14.

B.  Some families no longer feel safe sending their children to school, especially without school resource officers present.  Some students also feel unsafe on school grounds because of the gang violence on the Reservation, which often involves other juveniles, and the lack of law enforcement services to respond to that violence timely and effectively.  White Horse Decl. at ¶ 19; Star Comes Out Decl. at ¶¶ 15-16.

C.  Tribal health care costs have increased because of the increased number of overdoses and injuries sustained from assaults, domestic violence, and other crimes.  White Horse Decl. at ¶ 20; Star Comes Out Decl. at ¶ 17.

D.  The Tribal economy is negatively impacted as new businesses are not attracted to high-crime areas.  The businesses that are located on the Reservation must spend additional funds to protect their employees and property.  Some have even chosen not to remain open at night.  This results in additional hardships for Reservation residents and those businesses.  White Horse Decl. at ¶ 21; Star Comes Out Decl. at ¶¶ 18-19.

90.  These impacts and consequences are the result of the Defendants' failure to uphold their statutory, trust, and treaty obligations to provide adequate and effective law enforcement on the Reservation.

91.  The crisis in law enforcement, created by Defendants' failure to adequately fund law enforcement services on the Pine Ridge Reservation, or to deploy additional federal resources, is escalating.  Star Comes Out Decl. at ¶¶ 10-20; Star Comes Out Decl. Ex. 3; Young Decl. at ¶¶ 53-54; White Horse Decl. at ¶ 22.

### V.    The Tribe's Base Law Enforcement Funding under the ISDEAA

92.  The public safety commitments that the federal government made in the 1825 Treaty, the 1851 Treaty, and Articles I & V of the 1868 Treaty; the promises to protect each tribal individual's right to "property, person, and life" Congress made in the 1877 Act; and the minimum required to meet that commitment articulated by its adoption of the DOJ's Uniform Crime Data average as its national Indian law enforcement standard (and utilizing that standard in its 2011-2020 TLOA reports to Congress) establish a direct relationship between the number of calls for assistance to OST DPS made on the Pine Ridge Reservation and the number of law enforcement officers needed to answer those

complaints in an effective manner.  Defendants currently are failing to meet that standard in providing law enforcement at the Pine Ridge Reservation.

93.   In fact, currently the BIA has no treaty, trust, or needs-based method for determining the base amount of law enforcement funding it should be providing to the Tribe.  *See generally* Ex. 2 at 2 (noting the historic funding base for its law enforcement funding is the 1999 TPA allocation amount).

94.   Prior to 1998, BIA unilaterally chose to provide tribes with their BIA law enforcement funding through a process called the Tribal Priority Allocation System (hereinafter "TPA").  TPA is a budget allocation system that provides a tribe with a lump sum of money derived from combining the federal appropriations from a variety of BIA programs.  Once these funds are combined, the TPA system allows a tribe to allocate its share of those funds to a predetermined list of BIA functions, i.e., tribal government operations, human services, child welfare, and (until 1999) law enforcement.

95.   In the late 1990's, the DOJ had started making it easier for tribes to apply for and receive short term, highly specific, law enforcement grants from that agency.  As DOJ started to provide this short-term funding for law enforcement activities, the Tribe's dependence on the BIA's law enforcement monies, which were at the time being deposited into that lump sum TPA account, decreased temporarily and the Tribe was able to divert more TPA monies into other underfunded and pressing areas of need, such as social services.  White Horse Decl. at ¶¶ 23-29.

96.   Starting in 1998, DOJ offered the Tribe a short-term demonstration program to help better address crime and public safety problems.  White Horse Decl. at ¶ 23. This DOJ program was called the Comprehensive Indian Resources for Community and Law Enforcement

(hereinafter "CIRCLE").  This DOJ effort was expanded when the Tribe was awarded other CIRCLE related DOJ funding from its Community Oriented Policing Services (hereinafter "COPS") program and other DOJ funded programs.

97.   The Tribe applied for and accepted these CIRCLE and COPS funds with the full encouragement of both BIA and DOJ, and with the understanding that BIA would absorb the costs of the DOJ-funded law enforcement positions when the grants ran out.  White Horse Decl. at ¶ 24-26.  In fact, DOJ, as a condition to awarding the grant, required the Tribe to articulate who would cover the costs of the COPS-funded officers after the COPS grant expired.  *Id.* at ¶ 25.  BIA and DOJ were fully aware that the Tribe stated in its grant applications that the cost of those officers would be absorbed by the BIA's law enforcement program. *Id.* at ¶ 26.

98.   Instead, in calendar year 2006, the BIA requested and received funding to begin absorbing some of those tribal officers whose costs were then funded by DOJ COPS grants, and which were slated to expire.  "FY 2006 Budget Justification, United States Department of the Interior, Bureau of Indian Affairs" at BIA-SUM-13, a true and correct copy of which is attached hereto as Exhibit 3 to the Complaint.  Then in 2007, the BIA advised Congress that "[t]he Bureau is currently pursuing an MOU with the DOJ COPS office to address expiration of grants and the distribution of grants for new resources."  "FY 2007 Budget Justification, United States Department of the Interior, Bureau of Indian Affairs" at PSJ-4, a true and correct copy of which is attached hereto as Exhibit 4 to the Complaint.  The officers that the DOJ had been funding at the Pine Ridge Reservation were never absorbed by the BIA.  White Horse Decl. at ¶ 27.

99.   These COPS grants had been funding more than 50 additional law enforcement officers at

the Pine Ridge Reservation and reduced on-reservation crime for the five-year period that they were in effect. White Horse Decl. at ¶ 24.

100.    Thus, short term grants from DOJ were funding a significant percentage of the police force on the Pine Ridge Reservation in 1999-2006. *Id.*

101.    In 1998-1999, BIA unilaterally decided to move all its law enforcement funding out of the TPA funding system and reestablished that funding as the budget for a separate OJS-operated law enforcement program. Ex. 2 at 2; White Horse Decl. at ¶ 30.

102.    The Tribe was not, at first, worried about this because it had a full police force funded by the Defendant, United States, mostly from DOJ, and understood that the costs for those Oglala law enforcement positions funded by the DOJ would be absorbed by the BIA and added to its base budget when those COPS grants expired. White Horse Decl. at ¶ 26. However, the BIA did not absorb the costs for the COPS-funded law enforcement positions once the COPS grants expired. White Horse Decl. at ¶ 27.

103.    The BIA not only failed to provide funding for the costs of those DOJ funded law enforcement positions, it also chose to treat the amount of TPA funding that the Tribe allocated for law enforcement in 1999 (when those DOJ funds were already funding more than 50% of its Tribal officers) as the Tribe's new base budget for all OJS law enforcement activities from that point forward. White Horse Decl. at ¶¶ 30-31. *See also* Ex. 2 at 4 ("The amount of TPA funds that Tribes allocated to Law Enforcement and Detention/Corrections programs in 1999, when the TPA designation was removed, is the basis for the current funding levels distributed to each Tribe.").

104.    The BIA knowingly established the Tribe's base law enforcement budget from 1999 to the present using an amount that BIA knew was artificially low due to the fact that the Tribe

had been temporarily receiving CIRCLE and COPS grant funding to pay for over 50% of its law enforcement needs.  White Horse Decl. at ¶¶ 29-31.

105.   When the BIA failed to adjust the Tribe's base budget to fully accommodate the loss of those short-term DOJ-funded officers, BIA ignored its treaty and trust duties and the role that those DOJ CIRCLE, COPS, and the other DOJ short term programs were temporarily playing in the fulfillment of the federal government's trust and treaty responsibilities to the Oglala Sioux Tribe.

106.   This single, arbitrary BIA decision, which it continues to repeat annually, results in BIA's base funding for law enforcement services on the Pine Ridge Reservation remaining arbitrarily low, causing Defendants to remain out of compliance with their duties created in the 1825, 1851, and 1868 Treaties and reinforced/defined in BIA's minimum standards and subsequent federal statutes.  Young Decl. at ¶¶ 48-49; White Horse Decl. at ¶ 32.

107.   The BIA has not adjusted the base calculation of the Secretarial amount for the Tribe's law enforcement funding since 1999, despite the fact that the Tribe has added new residents and businesses, expanded its programs and services, and added new housing.  White Horse Decl. at ¶ 33.

108.   Based on the standard 2.8 officers per 1,000 service population, the Oglala Sioux Tribe currently needs more than 112 police officers to respond adequately to the current level and type of crimes on the Reservation and to achieve adequate public safety.  Young Decl. at ¶ 16.

109.   Even 112 officers are far too low when compared with what has been determined to be currently necessary in surrounding jurisdictions.  The Rapid City, South Dakota, police department has a budget of $19.6 million and 176 officers, yet in 2021 responded to fewer

police calls (114,816 calls).  *Rapid City Police Dep't*, City of Rapid City, available at https://www.rcgov.org/departments/police-department.html (last visited Jan. 18, 2024). Aberdeen, South Dakota, has 50 officers, and the State of Connecticut, which is about the same size geographically as the Pine Ridge Reservation, has 6,754 municipal police officers. *Police*, Aberdeen, S.D., available at https://www.aberdeen.sd.us/21/Police (last visited Jan. 18, 2024); Rute Pinho, *No. of Mun. Police Dep'ts in Conn.*, Conn. Gen. Assembly, Off. of Legis. Rsch., available at https://cga.ct.gov/2023/rpt/pdf/2023-R-0265.pdf (last visited Jan. 18, 2024).

110.   The current BIA base funding has no relationship to the Tribe's actual need for law enforcement services and fails to uphold the federal government's treaty duties of providing effective law enforcement to the Tribe on the Reservation.  Star Comes Out Decl. at ¶¶ 21-25; White Horse Decl. at ¶ 34.  In fact, the BIA has no needs-based methodology for calculating the Tribe's base law enforcement funding, or Secretarial amount.  Star Comes Out Decl. at ¶¶ 21-25; White Horse Decl. at ¶¶ 36-37.

111.   According to the OJS's November 2023 Public Safety & Justice TIBC Update on its funding methodology, it considers and ranks the local violent crime rate (35%), amount of unmet need (20%), percentage of unmet need (15%), land base (20%), and proportion of base funding to total base funding for all LE programs (10%).  Kidder Decl. Ex. 3, "OJS Public Safety & Justice TIB/C Update," at 7.  However, the OJS applies the methodology only to appropriated budget increases and one-time funding - not to base funding levels, or Secretarial amounts.  *Id.* at 4.

112.    By continuing to assign a base funding amount to the Tribe based upon the Tribe's 1999

TPA law enforcement budget, the BIA continues to act in an arbitrary and capricious

manner, and such ongoing actions continue to have deadly consequences.

### VI.    Notice to Defendants of the United States' Failure to Fulfill Law Enforcement Treaty Obligations

113.    The Tribe has repeatedly reminded the federal government of its treaty and trust law

enforcement obligations and has informed Defendants of their 1999-based funding errors

in meetings with the Department of the Interior (hereinafter "DOI"), OJS, and the White

House, yet the problems remain unaddressed.  Star Comes Out Decl. at ¶¶ 22-25; White

Horse Decl. at ¶ 38; Young Decl. at ¶¶ 10, 55.

114.    The Tribe has met with federal officials in the BIA, the OJS, and the DOI repeatedly to

notify the Defendants of the rampant unaddressed shortfalls in law enforcement funding

and the resulting crimes and related impacts occurring on the Reservation, and to request

the Defendants to fulfill their Treaty and statutory obligations.  Star Comes Out Decl. at ¶¶

22-24; White Horse Decl. at ¶ 38; Young Decl. at ¶¶ 55-56.

115.    The Tribe has also placed both monthly crime and drug violation reports into the federal

National Incident-Based Crime Reporting System (hereinafter "NIBRS"), a software

database operated by the OJS in conjunction with the Federal Bureau of Investigation.

These reports, which show some, but not all, of the volume and types of demands for police

services that are performed on the Pine Ridge Reservation, are available to all Defendants.

Young Decl. at ¶ 51.

116.    Additionally, BIA Superintendent Douville (hereinafter "Superintendent") receives regular

in-person or telephonic reports from the Tribal Council about the on-reservation public

safety crisis on the Pine Ridge Reservation.  The Superintendent also receives information

on current on-reservation crimes when attending or listening to the Oglala Sioux Tribal Council and its Tribal Law and Order Committee meetings, which are regularly broadcast on the local KILI Radio Station and online.  White Horse Decl. at ¶ 39.

## VII.    Current Violations of the Indian Self Determination and Education Assistance Act

117.    Under ISDEAA, the Secretary is "directed, upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs or portions thereof," services, functions, and activities administered by the Secretary.  25 U.S.C. § 5321(a)(1).

118.    ISDEAA also requires that "[t]he amount of funds provided under the terms of self-determination contracts . . . shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract . . .."  25 U.S.C. § 5325(a)(1).  For the Tribe, this is the amount required to fulfill the Secretary's duties of providing an adequate law enforcement program under the Treaties, the ILERA, and the TLOA.

119.    ISDEAA requires that "[i]n the negotiation of contracts and funding agreements, the Secretary shall—

(1) at all times negotiate in good faith to maximize implementation of the self-determination policy; and

(2) carry out this chapter in a manner that maximizes the policy of Tribal self-determination[.]" 25 U.S.C. § 5321(f).

120.    ISDEAA also provides that "[t]he amounts of such contracts may be renegotiated annually to reflect changed circumstances and factors, including, but not limited to, cost increases beyond the control of the tribal organization."  25 U.S.C. § 5324(c)(2).  The Secretary may decline a contract only after providing the Tribe with:

37

written notification . . . that contains a specific finding that clearly demonstrates that, or that is supported by a controlling legal authority that

(1)    the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;

(2)    adequate protection of trust resources is not assured;

(3)    the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;

(4)    the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 5325(a) of this title; or

(5)    the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities covered under paragraph (1) because the proposal includes activities that cannot lawfully be carried out by the contractor.

25 U.S.C. § 5321(a)(2).

121.    The Tribe has, for over 40 years, contracted with the Secretary under ISDEAA to administer the Secretary's exclusive law enforcement duties owed to the Tribe on the Reservation and has consistently communicated about the inadequate contract amount the government was offering.  Star Comes Out Decl. at ¶¶ 22-23; White Horse Decl. at ¶¶ 5, 37-39.

122.    The Tribe filed a Complaint in this Court with respect to the FY 2022 ISDEAA contract, and litigation is ongoing.  *Oglala Sioux Tribe v. United States*, No: 5:22-cv-05066-RAL, Doc. 78 (D.S.D. May 23, 2023) (Opinion and Order Denying Defendants' Motion to Dismiss and Ruling Upon Plaintiff's Motion for Preliminary Injunction).

123.    On September 21, 2022, the Tribe and OJS extended the existing 2022 contract (#A20AV00269) through September 30, 2023, to ensure there would be no lapse in the

provision of law enforcement services pending the outcome of litigation.  Young Decl. Ex. 2, "#A20AV00269 Modification 15."

124.    On August 16, 2023, Tribal President Star Comes Out requested a further extension of the FY 2022 contract (#A20AV00269) through September 30, 2024, to ensure there would be no lapse in the provision of law enforcement services pending the outcome of litigation. Star Comes Out Decl. at ¶ 31; Star Comes Out Decl. Ex. 7, "President Star Comes Out's August 17, 2023 Request for FY 2023 Contract Extension."

125.    On August 23, 2023, Defendant OJS agreed to extend the FY 2022 contract (#A20AV00269) through September 30, 2024, as a result of the litigation, but required the Tribe to pass a resolution authorizing the extension of the contract.  Star Comes Out Decl. Ex. 8, "BIA OJS's August 23, 2023 Letter Agreeing to Extend FY 2023 Contract."  The Executive Committee of the Oglala Sioux Tribe approved the extension of the FY 2022 Contract (#A20AV00269) until September 30, 2024, on November 8, 2023, through Resolution 23-77XB.  Star Comes Out Decl. Ex. 9, "November 8, 2023 OST Executive Committee Resolution Approving Extension of FY 2023 Contract."

126.    On October 27, 2022, the Tribe submitted its Criminal Investigation (hereinafter "CI") and Law Enforcement (hereinafter "LE") ISDEAA contract proposals for FY 2023.  Young Decl. at ¶¶ 58-60; Young Decl. Ex. 3, "FY 2023 CI ISDEAA Contract Proposal;" Young Decl. Ex. 4, "FY 2023 LE ISDEAA Contract Proposal."

127.    On January 11, 2023, the BIA OJS issued two separate initial review letters for the CI and LE proposals.  Star Comes Out Decl. Ex. 4, "BIA OJS's January 11, 2023 Initial Review of CI Contract Proposal;" Star Comes Out Decl. Ex. 5, "BIA OJS's January 11, 2023 Initial Review of LE Contract Proposal."

128. Using the same language in both letters, the BIA OJS stated that its

> initial review of the proposal reveals several issues that, if left unchanged, might provide potential grounds for declination or partial declination under the ISDEAA.  These include a request for funding in excess of the Secretarial amount; requests for automatically occurring annual increases; which may also prove to be in excess of the Secretarial amount; requests to contract functions that cannot be properly completed or maintained by the proposed contract; and requests that are beyond the scope of the programs, functions, services, or activities covered under Section 102 because the proposal includes activities that cannot lawfully be carried out by the contractor.

The BIA OJS offered technical assistance to revise the proposals.  Star Comes Out Decl. Ex. 4; Star Comes Out Decl. Ex. 5.

129. On January 25, 2023, just two weeks after the issuance of the initial review letters, Defendant Burge issued two separate declination letters for the CI and LE proposals.  "FY 2023 CI Partial Declination Letter January 25, 2023" (hereinafter "CI contract declination letter"), a true and correct copy of which is attached hereto as Exhibit 5 to the Complaint; "FY 2023 LE Partial Declination Letter January 25, 2023" (hereinafter "LE contract declination letter"), a true and correct copy of which is attached hereto as Exhibit 6 to the Complaint.

130. In the CI contract declination letter, the BIA OJS indicated its understanding that the Tribe was requesting $4,840,305.22 for each fiscal year from FY 2023 through FY 2025 as well as Contract Support Costs and Pre-Award and Startup Costs for ten (10) Criminal Investigators, at least one (1) Internal Affairs Officer, at least three (3) Drug Enforcement Investigators, at least one (1) Criminal Investigations supervisor, at least one (1) local Missing and Murdered/Cold Case Investigator, at least one (1) Program Analyst, and at least one (1) Law Enforcement Assistant.  The BIA OJS stated that, under the existing contract, "the Tribe has not previously performed" the Internal Affairs, Drug Enforcement,

or Missing and Murdered Unit functions and that the proposal sought to change several terms in the Statement of Work (hereinafter "SOW").  Ex. 5 at 1.

131.    The BIA OJS partially declined, citing 25 U.S.C. § 5321(a)(2)(D), and partially approved the Tribe's funding request, determining that $1,369,238 was the "Secretarial amount" and approving that portion of the request only.  Ex. 5 at 2.

132.    The BIA OJS declined the proposal request to add new Missing and Murdered Unit (hereinafter "MMU"), Drug Enforcement (hereinafter "DDE"), and Internal Affairs (hereinafter "IA") functions to the CI program, citing 25 U.S.C. § 5321(a)(2)(A), (C), and (D), and stating that "[t]he BIA OJS does not administer an MMU, Drug Enforcement, or IA program for the Tribe, and there is, therefore, no MMU, Drug Enforcement, or IA program to transfer to the Tribe under ISDEAA."  Ex. 5 at 2.

133.    The BIA OJS noted that its MMU, DDE, and IA Divisions "are nationwide programs that serve all 574 federally recognized tribes."  Ex. 5 at 2.  It reasoned, by dividing the total allocation to these programs by the number of federally recognized tribes, apparently assuming their needs were uniform, that the service to be rendered by awarding 0.15 of a full-time employee to the Tribe alone would not be satisfactory, and that otherwise, by awarding more than 1/574 of its allocation to the Tribe, that the services to be rendered to other tribes would not be satisfactory.  *Id*.

134.    The BIA OJS also stated that, if the Tribe sought to perform these functions and provide services to multiple tribes, these activities could not be lawfully carried out by the Tribe in the absence of tribal resolutions from each tribe to be served.  It cited 25 U.S.C. § 5321(a)(2)(A), (C), and (D), and alternatively (E), as justifying declination.  Ex. 5 at 2-3.

135.   The BIA OJS declined the portions of the proposal requesting to change aspects of the SOW, citing 25 U.S.C. § 5321(a)(2)(D) and (E). Ex. 5 at 3. Specifically, it declined the requests for automatic increases in the contract amount in FY 2024 and FY 2025 because such increases may exceed the Secretarial amount, 25 U.S.C. § 5321(a)(2)(D), and because contract amounts are subject to appropriations and may be reduced accordingly, 25 U.S.C. § 5325(b).  Ex. 5 at 3.

136.   The BIA OJS also declined the request to amend "shall" to "may" in SOW § C, Part (1)(H), at 15, citing 25 U.S.C. § 5321 (a)(2)(A) and (E), stating that "the Tribe could not lawfully carry out the CI program on Pine Ridge" unless it routinely assisted and cooperated "with the BIA and other federal, state, local, and tribal law enforcement officials . . . ."  Ex. 5 at 3.

137.   The BIA OJS declined the request to change SOW § C, Part (1)(I), at 15, citing 25 U.S.C. § 5321 (a)(2)(A), (C), and (E) and stating that the proposed request "cannot be lawfully carried out by the tribe[,]" "to the extent it would reserve the Tribe's right not to report all allegations of officer misconduct to BIA OJS's IA program . . . because it would prevent BIA OJS review of all officer misconduct required by 25 C.F.R. § 12.53."  Ex. 5 at 3.

138.   Similarly, the BIA OJS declined the request to change the SOW § C, Part (N)(2)(i), at 28, citing 25 U.S.C. § 5321(a)(2)(A), (C), and (E), "to the extent it suggests that those individuals adjudicating officer background investigations may not be 'trained and qualified security professionals'" determining this conflicted with 25 C.F.R. § 12.32 and that public safety services under the proposal "cannot be lawfully carried out by the Tribe." Ex. 5 at 4.

139. Finally, the BIA OJS declined the portion of the proposal concerning Pre-Award and Startup Costs, citing 25 U.S.C. § 5325(a)(5) and (6) due to its decisions regarding the proposed CI, MMU, DDE, and IA programs.  Ex. 5 at 4.

140. In the LE contract declination letter, the BIA OJS indicated its understanding that the Tribe was requesting $37,576,970 for each fiscal year from FY 2023 through FY 2025  as well as Contract Support Costs and Pre-Award and Startup Costs for about 112 patrol officers, two (2) fully equipped canine teams (hereinafter "K-9 units"), six (6) school resource officers, fifteen (15) communications officers, and two (2) communications supervisors. Ex. 6 at 1.

141. The BIA OJS partially declined the LE contract, citing 25 U.S.C. § 5321(a)(2)(D), and partially approved the Tribe's funding request, determining that $4,151,879 was the "Secretarial amount" and approved only that portion of the contract.  Ex. 6 at 2.

142. The BIA OJS declined the portion of the Tribe's LE contract proposal seeking to add the SRO function, citing 25 U.S.C. § 5321(a)(2)(A), (C), and (D) and reasoning that the service to be rendered would not be satisfactory, the additional funds sought would exceed the Secretarial amount, and there are no funds to transfer to the Tribe pursuant to ISDEAA because the BIA OJS does not operate an SRO function.  Ex. 6 at 2.

143. The BIA OJS declined to fund the Tribe's LE contract proposal to fund two (2) K-9 units, noting that the K-9 Unit within its Division of Drug Enforcement is "a nationwide program that serves all 574 federally recognized tribes."  Ex. 6 at 2.  It reasoned, by dividing the total allocation to this program by the number of federally recognized tribes, as if assuming their needs were uniform, that the service to be rendered by awarding 0.02 of a full-time employee to the Tribe alone would not be satisfactory, and that otherwise, by awarding

more than 1/574 of its allocation to the Tribe, that the services to be rendered to other tribes would not be satisfactory. Ex. 6 at 2. The BIA OJS also stated that, if the Tribe sought to perform this function and provide services to multiple tribes, these activities could not be lawfully carried out by the Tribe in the absence of tribal resolutions from each tribe to be served. It cited 25 U.S.C. § 5321(a)(2)(A), (C), (D), and (E) as justifying declination. Ex. 6 at 2-3.

144.    The BIA OJS declined the portions of the proposal requesting to change aspects of the SOW, citing 25 U.S.C. § 5321(a)(2)(D) and (E). Specifically, it declined the requests for automatic increases in the contract amount in FY 2024 and FY 2025 because such increases may exceed the Secretarial amount, 25 U.S.C. § 5321(a)(2)(D), and because contract amounts are subject to appropriations and may be reduced accordingly, 25 U.S.C. § 5325(b). Ex. 6 at 3.

145.    The BIA OJS also declined the request to amend "shall" to "may" in SOW § C, Part (1)(H), at 17, citing 25 U.S.C. § 5321 (a)(2)(A) and (E), stating that "the Tribe could not lawfully carry out the LE program on Pine Ridge" unless it routinely assisted and cooperated "with the BIA and other federal, state, local, and tribal law enforcement officials . . . ." Ex. 6 at 3.

146.    The BIA OJS declined the request to change SOW § C, Part (1)(I), at 17, citing 25 U.S.C. § 5321 (a)(2)(A), (C), and (E) and stating that the proposed request "cannot be lawfully carried out by the tribe[,]" "to the extent it would reserve the Tribe's right not to report all allegations of officer misconduct to BIA OJS's Internal Affairs (IA) program . . . because it would prevent BIA OJS review of all officer misconduct required by 25 C.F.R. § 12.53." Ex. 6 at 3-4.

44

147.   The BIA OJS further declined the request to amend SOW § C, Part (1)(I)(2), at 17, citing 25 U.S.C. § 5321(a)(2)(A), (B), and (E), by inserting the word "clear" because it would conflict with 25 C.F.R. § 12.54 and "improperly create an option for the Tribe *not* to report some civil rights allegations to the BIA OJS IA program[.]" Ex. 6 at 4.

148.   Citing 25 U.S.C. § 5321(a)(2)(E), the BIA OJS declined the request to amend SOW § C, Part (1)(I)(3), at 18, "to create an actionable breach of contract action for the failure of the BIA OJS IA program to render a 'timely' written decision" as "only Congress, and the BIA OJS, has the authority to change the terms of what may constitute a breach of contract under ISDEAA." Ex. 6 at 4.

149.   The BIA OJS declined the request to change the SOW § C, Part (N)(2)(i), at 28, citing 25 U.S.C. § 5321(a)(2)(A), (C), and (E), "to the extent it suggests that those individuals adjudicating officer background investigations may not be 'trained and qualified security professionals'" determining this conflicted with 25 C.F.R. § 12.32 and that public safety services under the proposal "cannot be lawfully carried out by the Tribe." Ex. 6 at 4.

150.   Finally, the BIA OJS declined the portion of the proposal concerning Pre-Award and Startup Costs, citing 25 U.S.C. § 5325(a)(5) and (6) due to its decisions regarding the LE program, SRO, and canine team functions. Ex. 6 at 4.

151.   By letter dated January 31, 2023, Tribal President Star Comes Out responded to the two January 25, 2023 declination letters, in relevant part, as follows:

> While the Oglala Sioux Tribe appreciates your initial review of our FY 2023 proposals, we remain distressed by the fact that neither of your two letters addresses any of the issues raised in our formal appeal of your denial of our FY 2022 contract proposal.
> Because an initial federal court hearing on our appeal is scheduled for February 8-9, 2023, we do not believe that either the Tribe or the Regional Office will benefit from your kind offer of technical assistance at this time.

45

> In the interim, the Oglala Sioux Tribe continues to experience a level of felonies and other crimes which it quite simply lacks the officers, equipment and funding to address.

Star Comes Out Decl. Ex. 6, "President Star Comes Out's January 31, 2023 Response to FY 2023 Partial Declination Letters." The letter concluded by emphasizing the Tribe's insistence that the "cooperative relationship" between the governments "be based upon the commitments the United States made in our 1825, 1851, and 1868 Treaties and on the trust responsibility that the United States owes to the Tribe and its members." *Id.*

152.   The January 25, 2023 CI contract and LE contract partial declination letters failed to consider: (1) the number of calls for assistance to OST DPS (1868 Treaty "complaints") received on the Pine Ridge Reservation, (2) the crime and drug numbers provided by the Tribe's monthly law enforcement reports, (3) the unreasonableness of having 33 police officers respond to over 133,755 emergency calls across 5,400 square miles of the Reservation; (4) the federal government's statutory duties and obligations under the ILERA and the TLOA; (5) the United States' 1825, 1851, and 1868 Treaty obligations or its trust responsibilities to the Tribe; (6) the BIA's minimum required law enforcement coverage of 2.8 officers per 1,000 service population; or even (7) the law enforcement issues that the Oglala Sioux Tribe has consistently raised in meetings with OJS and DOI representatives for over 24 years.

153.   The partial declinations were also arbitrary and capricious for the following reasons: (1) the Tribe proposed carrying out only those DDE (including K-9 units), SRO, IA, and MMU contractible functions that are local in nature and would not interfere with the activities DOI is performing at a regional or national level, Young Decl. at ¶ 61; Young Decl. Ex. 3 at 19; Young Decl. Ex. 4 at 21.

(2) the Tribe is currently performing federally funded drug enforcement, murder investigation, and missing persons functions and operating K-9 units under its existing ISDEAA LE and CI contracts, but the Tribe needs additional staff and funding to meet the increased case load for these responsibilities.  Young Decl. at ¶¶ 62-63.

(3) BIA OJS has admitted that it has funded SRO positions for direct funded service tribes for some BIE schools in 2022 and in 2023, proving it has SRO funding.  Young Decl. at ¶ 39.  *See also* Kidder Decl. Ex. 2, "November 16, 2023 Memorandum from Defendants to Peebles Kidder, LLP, Ex. C – MMU, DEA, IA and SRO;"

(4) OJS has received appropriations from Congress specifically for the SRO, DDE (including K-9 units) and MMU programs for FY 2023 by continuing resolution; and

(5) the Tribe has existing K-9 units funded with one-time OJS allocations of funds but needs additional funds for additional units. Young Decl. at ¶¶ 63-64.

The law has not changed.  Therefore, DDE (including K-9 units), MMIP and SRO programs are contractable, and the rationale provided by the Secretary in the partial declination that the function is not contractable is inapplicable. 25 U.S.C. § 5321(a)(2).

154. Any decision to fund direct services tribe SRO positions and not ISDEAA contracted law enforcement contracts for these positions is arbitrary and not in accordance with the requirements of 25 U.S.C. § 5321(a)(1) or (2) which establish that the function is contractible and that do not provide discretion to the Secretary to fund one tribe but not another tribe for SRO positions.

155. In FY 2023 by Continuing Resolution, Congress appropriated $1,270,756.00 for the SRO Program, and BIA OJS did receive those funds for the SRO Program.  "FY 2023 Budget Justification, United States Department of the Interior, Bureau of Indian Affairs" at IA-PSJ

2-18 and Appendix 5-1, a true and correct copy of which is attached hereto as Exhibit 7 to Complaint.

156.    BIA OJS's decision not to include SRO funding as a delegable duty and not to fund additional officers and investigators also ignores the increased number of firearms Tribal police have taken from juveniles in the last year, the gang related violence involving juveniles, and the threats that exist in all K-12 schools from active shooters in this country. It also ignores the federal government's existing obligation to address the other criminal activities taking place at on-reservation schools, including, but not limited to the following: weapons possession, theft, violence and threats of violence, suicide attempts, and the use of dangerous substances that are not federally banned.  None of these can be addressed by a federal DDE unit in Rapid City.  Young Decl. at ¶ 43.

157.    Although the BIA OJS operates its own federally operated DDE (including K-9 units) and MMU Units in South Dakota, those units are located over eighty (80) miles away in Rapid City and rarely respond to drug cases or MMU cases on the Reservation.  Young Decl. at ¶ 41.

158.    The Oglala Sioux Tribe Department of Public Safety (hereinafter "OST DPS") is already primarily responsible for responding to MMU cases occurring on the Pine Ridge Reservation.  Young Decl. at ¶¶ 41, 44-45.  The OJS MMU did not assist with any missing persons cases on the Pine Ridge Reservation and denied one request for assistance from the OST DPS in FY 2023.  Young Decl. at ¶ 45.

159.    The OST DPS is already conducting its own drug enforcement operations and is required to be involved with all OJS DDE operations conducted on the Pine Ridge Reservation. Young Decl. at ¶ 41.

160.    The OJS DDE has on at least one recent occasion failed to coordinate with the OST DPS in its planned operations, resulting in the operation being rescheduled.  Young Decl. at ¶ 42.

161.    ISDEAA requires that each provision of ISDEAA "shall be liberally construed for the benefit of the [Tribe]."  *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 194 (2012) (quoting 25 U.S.C. § 5329(c) (Model Agreement § 1(a)(2)).  "The Government, in effect, must demonstrate that its reading is clearly required by the statutory language." *Id.*

162.    As a result of the actions and failures to act described herein, the Tribe has been and continues to be harmed.

163.    The Tribe has exhausted all of its administrative remedies in this matter.

## FIRST CLAIM FOR RELIEF

### Violation of Treaty, Statutory, and Common Law Trust Duty: The United States' Failure to Provide Adequate and Effective Law Enforcement Services

164.    The Tribe realleges the preceding paragraphs and incorporates them by this reference.

165.    By proposing, incorporating, and ratifying Articles I, II, and V of the 1825 Treaty, the 1851 Treaty, and the "bad men" clauses in Article I and Article V of the 1868 Treaty, and imposing federal criminal jurisdiction and federal law enforcement responsibility on the Pine Ridge Reservation, the United States obligated itself to provide a sufficient number of properly equipped law enforcement officers and criminal investigators on the Reservation to ensure the timely investigation and reporting of all crimes, and the arrest and punishment of all offenders who violate federal law or otherwise threaten or harm the Tribe or its property, or the person or property of any Tribal member.

166.    This federal commitment was part of the consideration promised in exchange for the Tribe curtailing its sovereign authority and practical ability to deal with criminal acts as it had

been for centuries, to allow open passage through Tribal lands and a guarantee of peace. It is the foundation of the trust obligation owed by Defendants to the Tribe to provide adequate and effective law enforcement services.

167.   Today, as in 1825, 1851, and 1868, the Pine Ridge Reservation remains under federal criminal jurisdiction and law enforcement authority. Today, as in 1877, this federal commitment is necessary to ensure the Tribe an orderly government and to ensure the safety of persons and property on the Pine Ridge Reservation.

168.   Pursuant to the 1825, 1851, and 1868 Treaties, the 1877 Act, the 1921 Snyder Act, the Indian Law Enforcement Reform Act, and the Tribal Law and Order Act of 2010, Defendants have a specific, special trust duty to provide adequate and effective law enforcement services to the Tribe and its members and promptly and diligently investigate and report crimes and immediately arrest and punish offenders.

169.   Having bargained for and undertaken federal responsibility for law enforcement services on the Pine Ridge Reservation, the United States has a trust obligation to provide sufficient financial support to the Tribe for law enforcement services adequate to provide for adequate and effective law enforcement.

170.   The mechanism through which this trust obligation has been implemented since the enactment of the ISDEAA, has been, pursuant to that Act, to contract with the Tribe, pursuant to which the Tribe performs the law enforcement responsibilities and functions of the Secretary, the Bureau of Indian Affairs and the Office of Justice Services, and pursuant to which Defendants are to provide the Tribe with funding equal to the amount that would be spent by the Secretary to directly provide such functions in compliance with the United States' treaty and trust obligations.

171. The Defendants' decisions not to increase the base funding for the Tribe's CI and LE contracts have made it impossible for the United States to fulfill its treaty and trust obligations to the Tribe and to its members on the Reservation.  Star Comes Out Decl. at ¶ 25; Young Decl. at ¶¶ 48-49.

172. The Defendants have breached and continue to breach their treaty obligations under the 1825, 1851, and 1868 Treaties and their trust duty to the Tribe and its members by providing law enforcement services to the Tribe at levels that fall substantially below the levels necessary for the effective law enforcement that is required by Articles I and V of the 1868 Treaty, the 1851 Treaty, the duty of protection under Articles I, II, and V of the 1825 Treaty, and the BIA's minimum law enforcement standards.

173. There is a substantial controversy between the Tribe and the Defendants of sufficient immediacy and reality to warrant the issuance of a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

174. The Tribe asks this Court to declare that the proper interpretation and construction of the obligations undertaken by and through the 1825 Treaty, the 1851 Treaty, the 1868 Treaty, the 1877 Act, the 1921 Snyder Act, the ILERA and the TLOA, and the trust relationship between the United States and the Tribe thereunder, is that the United States is legally obligated to provide for and to ensure adequate and effective law enforcement to the Tribe within the Pine Ridge Reservation.

## SECOND CLAIM FOR RELIEF

### Breach of Trust Responsibilities to Provide an Accounting

175. The Tribe realleges the preceding paragraphs and incorporates them by this reference.

176. A Tribe may bring a claim for mismanagement and accounting in the District Court. *Cobell v. Babbitt*, 30 F. Supp. 2d 24, 40 (D.D.C. 1998).

177. The Defendants have an obligation to not take actions or fail to act in a manner that results in the "termination of any existing trust responsibility of the United States with respect to the Indian people."  25 U.S.C. § 5332.

178. The Defendants also have an obligation not to reduce funds "to make funding available for contract monitoring or administration by the Secretary[.]" 25 U.S.C. § 5325(b)(1).

179. The request to require accounting of law enforcement dollars appropriated by Congress is a request for specific remedies, which are an attempt to give the Tribe the thing to which it is entitled.  *Modoc Lassen Indian Hous. Auth. v. U.S. Dep't of Hous. & Urban Dev.*, 881 F.3d 1181, 1196 (10th Cir. 2017).  The Tribe is entitled to request and review Defendants' use of law enforcement funds to ensure the Defendants are abiding by federal laws.

180. By controlling and supervising law enforcement funding through federal actions, Defendants have undertaken a fiduciary relationship to the Tribe.  *See United States v. Mitchell*, 463 U.S. 206, 225 (1983).  The fiduciary relationship exists regardless of whether there is express language under a "statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection."  *Id*.  In fact, the presumption is that "all funds held by the United States for Indian tribes are held in trust."  *Rogers v. United States*, 697 F.2d 886, 890 (9th Cir. 1983).

181. The Defendants have an obligation "to perform a complete historical accounting of" assets. *Cherokee Nation v. U.S. Dep't of Interior*, 531 F. Supp. 3d 87, 99 (D.D.C. 2021) (quoting *Cobell v. Norton*, 240 F.3d 1081, 1102 (D.C. Cir. 2001)).  This "report must contain sufficient information for the beneficiary readily to ascertain whether the trust has been faithfully carried out."  *Id.* (quoting *Cobell*, 240 F.3d at 1103).

182.    The Defendants' use of 1999 TPA funding levels for law enforcement as its base law enforcement budget for the Tribe has prejudiced the Tribe because the Tribe's 1999 TPA law enforcement budget was abnormally low, resulting from the Tribe's participation in the DOJ CIRCLE, COPS and other short-term DOJ grant programs.

183.    The Defendants' use of 1999 TPA based funding levels and 2013 BIA Labor Force Report service population numbers has resulted in an arbitrary and capricious distribution of law enforcement funds and services and unfair treatment of the Tribe in relation to other tribes.

184.    The January 25, 2023 partial declination letters, including the Tribe's proposal to operate the SRO, DDE, MMU, and IA programs, were based on arbitrary and capricious base funding levels and service population numbers.

185.    An accounting of the use of funds requested from and allocated by Congress under the TLOA, the ILERA, and the 1921 Snyder Act for law enforcement services from 1998 to the present time is a basic obligation of the Defendants in fulfillment of their treaty and trust responsibilities to the Tribe.

186.    The Tribe requests a declaratory judgment that the Defendants have a trust obligation to provide an accounting to the Tribe of the funds and uses of funds appropriated to Defendants by Congress for law enforcement services from 1998 to the present time.

187.    The Tribe requests an order compelling the Defendants to provide a detailed accounting to the Tribe of its appropriations requests to the DOI, to OMB and to the Congress and the responses thereto, and of the funds received and used by each individual division of BIA and OJS from 1998 through the present date for law enforcement services.  This accounting should include the following: (1) all OJS requests to DOI for inclusion in the President's budget request to Congress, and all responses thereto; (2) all requests made from DOI to

OMB for the same purpose, and the responses thereto; (3) all direct, contracted and administrative funding provided to OJS by the Congress and/or DOI, including all specialty programs (including, but not limited to, the Drug Task Force, MMU Task Force, Police Academy, Internal Affairs Division, each District Office and each tribal law enforcement location (whether direct service or tribally contracted)).  Such accounting shall be by tribe or location, fiscal year, amount, and scope of work, and shall note: (1) the service population of each tribe or location served by OJS; (2) all payments of bonuses, special employee awards, or incentive payments made to federal OJS employees; (3) the GS Ratings for all OJS full-time equivalent employees; and (4) such other accounting information as the Court deems appropriate.

### THIRD CLAIM FOR RELIEF

### Declination of Law Enforcement and Criminal Investigations Programs in Violation of ISDEAA, 25 U.S.C. §§ 5301-5423

188.   The Tribe realleges the preceding paragraphs and incorporates them by this reference.

189.   The ISDEAA requires "[t]he amount of funds provided under the terms of self-determination contracts . . . shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract . . .."  25 U.S.C. § 5325(a)(1).  It also requires that the Secretary "at all times negotiate in good faith to maximize implementation of the self-determination policy[,]" 25 U.S.C. § 5321 (f)(1), and specifically provides that ISDEAA "contracts may be renegotiated annually to reflect changed circumstances and factors, including, but not limited to, cost increases beyond the control of the tribal organization."  25 U.S.C. § 5324(c)(2).

190.    The Secretary is required to approve a proposed ISDEAA contract, and such contract is deemed approved, 25 C.F.R. § 900.18, unless the Secretary provides within ninety days from receipt of the proposal "written notification to the applicant that contains a specific finding that clearly demonstrates that, or that is supported by a controlling legal authority that" the proposal is declined under one or more of five specific circumstances.  25 U.S.C. § 5321(a)(2).  *See also* 25 C.F.R. § 900.29 (requiring from the Secretary a "specific finding that clearly demonstrates . . . one of the conditions . . . together with a detailed explanation of the reason for the decision to decline the proposal and, within 20 days, any documents relied on in making the decision[.]")

191.    Defendants' January 25, 2023 partial declination letters contain no specific findings or detailed explanation of the reason for the declination of the Tribe's proposal to operate the LE and CI programs at a higher funding level.  The letters merely declined the funding requests to the extent each "exceeds the amount that the Secretary would have spent to operate [that] program on Pine Ridge, *i.e.*, the Secretarial amount." Ex. 5 at 2; Ex. 6 at 2. The letters neither provided any details nor documentation of the determination of the § 106(a)(1) amount claimed to have been exceeded, which is the sole ground for refusal. There is also no explanation as to why the Tribe is tied to the dollar amount claimed to have been exceeded, particularly in light of the lump sum appropriated to the BIA by Congress and the obligations undertaken by Defendants in the Tribe's 1825, 1851, and 1868 Treaties.

192.    The January 25, 2023 partial declination letters also reference the January 11, 2023 initial review letters, which in turn fail to provide a detailed explanation and the documents relied

on by Defendants in making their determination that the funding requested exceeded the "Secretarial amount."

193. Stating that the amount sought for the programs is in excess of the previously approved AFAs does not, however, "clearly" demonstrate with a "detailed explanation" why the Tribe is tied to the previous year's funding, especially when that funding is tied to what has been shown to be incorrect and incomplete information.  It also does not meet treaty or trust obligations and is based upon an artificially low base contract amount arbitrarily and capriciously assigned to the Tribe by BIA over twenty years ago.  Any statutorily sufficient explanation must, at a minimum, address how Defendants arrived at their determination of the 106(a)(1) amounts for the LE and CI programs so that the Tribe may determine why its proposals are in excess of those amounts.  Merely stating that it is in excess of the previous year's AFAs is not a clear, detailed explanation, particularly when the previous year's funding is also inadequate.

194. The Tribe submitted its proposals to amend the contract and the AFAs for FY 2023 by email on October 27, 2022.  Although Defendants' January 25, 2023 letters were issued within 90 days (the time period within which any declination must be issued), they do not meet the statutory or regulatory requirements for an effective declination of the Tribe's proposals.

195. The 90-day period within which the Secretary is permitted to decline has passed; it expired on January 25, 2023.

196. The Tribe requests a declaratory judgment that the partial declinations of funding for the Tribe's LE and CI programs violates the ISDEAA, 25 U.S.C. § 5321(a)(1)(E) and (a)(2) and 25 C.F.R. § 900.29.

197.   The Tribe also requests an order requiring the Secretary to (1) approve the Tribe's proposed contracts to operate the LE and CI programs and approve the Tribe's proposed AFAs for FY 2023 related to those programs; (2) award the amended contracts and the new AFAs as proposed for the operation of those programs; and (3) add to the contracts the full amount of Title I funds pursuant to § 106(a)(1) of the ISDEAA for the operation of those programs.

### FOURTH CLAIM FOR RELIEF

### Declination of SRO, DDE, MMU, and IA Programs in Violation of the ISDEAA, 25 U.S.C. §§ 5301-5423

198.   The Tribe realleges the preceding paragraphs and incorporates them by this reference.

199.   Defendants' January 25, 2023 partial declination letters do not contain any specific findings based on actual facts for the declination of the Tribe's proposal to operate the SRO, DDE (including K-9 units), MMU, and IA functions.  Ex. 5 at 2-3; Ex. 6 at 2-3.  The letters do not comply with the statutory or regulatory requirements for denying an ISDEAA contract under 25 U.S.C. § 5321(a)(2) and 25 C.F.R. § 900.29, as they include no specific finding clearly supporting the ground recited, offer no detailed explanation of the facts on which the conclusions reached by the agency were based, nor cite to controlling legal authority that clearly demonstrates why the listed declination criteria apply.

200.   On November 8, 2023 OJS and awarding official Defendant Burge informed the Oglala Sioux Tribe that OJS divides funding for the DDE (including K-9 units), MMU and IA functions equally among all tribes served by OJS, regardless of the number of cases or the service population served, and based on that calculation, the allocation of funding for DDE functions per tribe is $21,951 per tribe, for K-9 units is $2,787 per tribe, for MMU functions is $25,261 per tribe, and for IA functions is $6,446 per tribe.  Kidder Decl. Ex. 1 at 21:14-22:23; 75:16-24; Kidder Decl. Ex. 2.

201.   The division of DDE (including K-9 units), MMU and IA funds equally among all 196 tribes served by BIA OJS, or among 574 tribes of whom 378 do not receive any OJS LE-CI contract funding or have OJS CE-LI operated programs, is not rationally based, given the differences in population served, land base and number of DDE, MMU and IA cases resulting from those differences.

202.   Defendants' January 25, 2023 partial declination letters continue to disregard the requirements of ISDEAA and its regulations.  Simply noting to the Tribe that the DDE (including K-9 units), MMU, and IA programs are "nationwide" functions that may not be lawfully carried out by the Tribe does not meet the requirements of 25 U.S.C. § 5321(a)(2) and 25 C.F.R. § 900.29.  This decision ignores the fact that the Tribe sought only to contract the local portions of the programs, those necessary for their day-to-day operation and for the health and safety of the Tribal community.

203.   The Tribe submitted its proposals to amend the contract and the AFAs for FY 2023 by email on October 27, 2022.  Although Defendants' January 25, 2023 letters were issued within 90 days (the time period within which any declination must be issued), they do not meet the statutory or regulatory requirements for an effective declination of the Tribe's proposals.

204.   The 90-day period within which the Secretary is permitted to decline has passed; it expired on January 25, 2023.

205.   The Tribe requests a declaratory judgment that the partial declination of funding for the SRO, DDE (including K-9 units), MMU, and IA programs in the Tribe's proposals to operate the SRO, DDE (including K-9 units), MMU, and IA programs violates the ISDEAA, 25 U.S.C. § 5321(a)(1)(E) and (a)(2).

206.    The Tribe also requests an order requiring the Secretary to: (1) approve the Tribe's proposed contracts to operate the SRO, DDE (including K-9 units), MMU, and IA programs and approve the Tribe's proposed AFAs for FY 2023 related to those programs; (2) award the amended contracts and the new AFAs as proposed for the operation of those programs; and (3) add to the contracts the full amount of Title I funds pursuant to § 106(a)(1) of the ISDEAA for the operation of those programs.

## FIFTH CLAIM FOR RELIEF

### Declination of the Tribe's Proposals to Operate the LE and CI Programs in Violation of the ISDEAA, 25 U.S.C. §§ 5301-5423

207.    The Tribe realleges the preceding paragraphs and incorporates them by this reference.

208.    Even if Defendants' January 25, 2023 partial declination letters were considered an effective declination, Defendants have not met their burden of proof, which is "to establish by clearly demonstrating the validity of the grounds for declining the contract proposal (or portion thereof)."  25 U.S.C. § 5321(e)(1).

209.    Defendants' January 25, 2023 partial declination letters cite 25 U.S.C. § 5321(a)(2)(D) in partially refusing the Tribe's LE and CI programs and state that each "exceeds the amount that the Secretary would have spent to operate [that] program on Pine Ridge, *i.e.*, the Secretarial amount."  Ex. 5 at 2; Ex. 6 at 2.

210.    In the January 25, 2023 partial declination letters, there is no discussion of how the base secretarial funding amounts of $1,369,238 (CI) and $4,151,879, which the Secretary would have provided had it run the LE or CI program under its treaty and statutory obligations, were "determined" as required by ISDEAA § 106(a)(1).  25 U.S.C. § 5325(a)(1).

211.    The January 25, 2023 partial declination letters also fail to assert that the LE or CI programs funded by the § 106(a)(1) amount would be ineffective, unnecessary, or obsolete.  Thus,

the letters contain no consideration, much less determination, of what funding level is "applicable" under the ISDEAA or the Treaties, or is necessary to carry out the standards required under the TLOA and the ILERA, and incorporated into the BIA Law Enforcement Handbook at 25 C.F.R. §§ 12.11, 12.14.  There is no showing that the Tribe's proposal was excessive in light of the United States' treaty obligations, and in light of and the demonstrated errors in the base funding amount.  Defendants' failure to make a finding relevant to this criterion renders the partial declination deficient and arbitrary, capricious, and contrary to law.

212.  The BIA and OJS decision to calculate the Tribe's § 106(a)(1) amounts using a base amount actually expended from TPA funds in 1999 renders Defendants' partial disapproval of the Tribe's contract proposals to operate its LE and CI programs legally deficient and arbitrary.  Nothing in the Treaties, the ISDEAA, the ILERA, or the TLOA authorizes or allows such an outcome.

213.  The amount of funds required under ISDEAA § 106(a)(1) "shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof *for the period covered by the contract*."  25 U.S.C. § 5325(a)(1) (emphasis added).  The ISDEAA does not permit the agency to simply pick a funding amount it used at any prior random point in time of its own choosing and impose that historic base funding amount on a tribe as its current § 106(a)(1) amount.  Rather, Congress directs that the § 106(a)(1) amount represents what the "Secretary would have otherwise provided for the operation of the programs" at the time of contracting.  Given the current service population, the size of the Reservation, the Tribe's level of criminal activity, and the 165,799 calls for assistance to OST DPS, this cannot be the amount calculated using the base funding the

60

Secretary provided more than twenty years ago, when relevant conditions were vastly different, and cannot be the amount provided during a point in time when the amount of funds the Secretary "would have otherwise provided" was temporarily and artificially lowered by a substantial amount due to outside short-term DOJ funding.

214. The Defendants' actions violate the purpose of the ISDEAA, which is to end "the prolonged Federal domination of Indian service programs" by giving "Indian people an effective voice in the planning and implementation of programs for the benefit of Indians which are responsive to the true needs of Indian communities[.]" 25 U.S.C. § 5301(a)(1).

215. Defendants' actions and failures to take corrective action violate the ISDEAA's express statutory obligation to carry out a meaningful Indian self-determination policy, which transitions away from federal domination of programs for Indians to allow meaningful participation by Indian people in the planning conduct and administration of federal programs, and to further the goal of "supporting and assisting Indian tribes in the development of strong and stable tribal governments . . . ." 25 U.S.C. § 5302(b).

216. 25 U.S.C. § 5321(f) requires that the Secretary "at all times negotiate in good faith to maximize implementation of the self-determination policy[.]"

217. The Defendants' actions violate the duty of fair dealing in negotiating ISDEAA contracts by making a take-it-or-leave-it offer to the Tribe without any regard for the United States' treaty and trust obligations, or any arm's length negotiation.

218. Defendants cannot claim "good faith" negotiations when their representatives are unwilling to discuss the contract price or the contract's scope of work.

219. Defendants engaged in bad faith negotiations by refusing to negotiate the contracts' incorporation of SROs, MMU, DDE and IA functions. Defendants also engaged in "bad

faith" by notifying the Tribe that Defendants were only willing to approve a specific contract amount for each contract, and by arbitrarily reaching the contract amount in the absence of any treaty considerations or contract negotiation whatsoever.

220.    In the absence of any negotiations whatsoever, a take-it-or-leave-it letter does not meet the "good faith" requirements of 25 U.S.C. § 5321(f).

221.    Imposing such an outcome also violates several Indian self-determination policies articulated by the Secretary and Congress, including the commitment to the following:

(1)    "The Secretary shall afford Indian tribes . . . the flexibility, information, and discretion necessary to design contractable programs to meet the needs of their communities . . .." 25 C.F.R. § 900.3(b)(3).

(2)    "Federal laws and regulations should be interpreted in a manner that will facilitate the inclusion of those programs or portions of those programs that are for the benefit of Indians . . .. 25 C.F.R. § 900.3(b)(8).

(3)    "The amounts of [ISDEAA] contracts may be renegotiated annually to reflect changed circumstances and factors, including, but not limited to, cost increases beyond the control of the tribal organization."  25 U.S.C. § 5324(c)(2).

222.    The Tribe requests that the Court enter an order finding that the January 25, 2023 partial declinations of the Tribe's proposals to operate the LE and CI programs are arbitrary and capricious and otherwise not in accordance with law.

223.    The Tribe requests a declaratory judgment that the Defendants, as a matter of law, were required to: (1) approve the Tribe's proposed contracts to operate the LE and CI programs and approve the Tribe's proposed AFAs for FY 2023 related to those programs; (2) award the amended contracts and the new AFAs as proposed for the operation of those programs;

and (3) add to the contracts the full amount of Title I funds pursuant to § 106(a)(1) of the ISDEAA for the operation of those programs and (4) add to those contracts an amount appropriate to fulfill the United States' treaty and trust obligations to provide adequate and effective law enforcement to the Tribe within the Pine Ridge Reservation.

224.    The Tribe further requests the Court to enter an Order compelling agency action unlawfully withheld or unreasonably delayed pursuant to 5 U.S.C. § 706(1), namely compelling Defendants to: (1) approve the Tribe's proposed contracts to operate the LE and CI programs and approve the Tribe's proposed AFAs for FY 2023 related to those programs; (2) award the amended contracts and the new AFAs as proposed for the operation of those programs; (3) add to the contracts the full amount of Title I funds pursuant to § 106(a)(1) of the ISDEAA for the operation of those programs; and (4) add to those contracts an amount appropriate to fulfill the United States' treaty and trust obligations to provide adequate and effective law enforcement to the Tribe within the Pine Ridge Reservation.

**SIXTH CLAIM FOR RELIEF**

**Declination of the Tribe's Proposals to Operate the SRO, DDE (including K-9 units), MMU, and IA Programs in Violation of the ISDEAA, 25 U.S.C. §§ 5301-5423**

225.    The Tribe realleges the preceding paragraphs and incorporates them by this reference.

226.    The declination criteria cited in the January 25, 2023 partial declination letters with respect to the Tribe's proposals to operate the SRO, DDE (including K-9 units), MMU, and IA programs are that the BIA OJS does not currently operate such programs for the Tribe; the results of awarding a portion of the resources it expends on its nationwide programs to the Tribe would be that the functions "will not be satisfactory[,]" will not "be properly completed or maintained by the proposed contract[,]" and will not be "lawfully carried out

by the" Tribe; and that awarding more funds would exceed the Secretarial amount.  25 U.S.C. § 5321(a)(2)(A), (C), (D), (E).  Ex. 5 at 2; Ex. 6 at 2.

227. Defendants' declination is incorrect as a matter of law because the Tribe's proposal clearly purports to contract only the local portions of these functions, and Section B of the contract proposal describes the Program Standards the Tribe would follow in performing these programs and specifically obligates the Tribe to operate these programs in compliance with the BIA Law Enforcement Handbook.  *See also* 25 C.F.R. §§ 12.11, 12.14.

228. The ILERA states that, "[s]ubject to the provisions of [this Act] and other applicable Federal or tribal laws, the responsibilities of the Office of Justice Services in Indian country *shall include-- . . . in cooperation with appropriate Federal and tribal law enforcement agencies, the investigation of offenses against criminal laws of the United States*[.]"  25 U.S.C. § 2802(c)(2) (emphasis added).

229. Applicable federal or Tribal laws do not limit this cooperative approach to law enforcement in Indian Country by removing the SRO, DDE (including K-9 units), MMU, and IA programs from tribal operations as Defendants appear to suggest.

230. In passing the TLOA, Congress expressly found that "tribal law enforcement officers are often the first responders to crimes on Indian reservations; and . . . tribal justice systems are often the most appropriate institutions for maintaining law and order in Indian country[.]" TLOA, § 202(a)(2).

231. The TLOA's purpose is "to empower tribal governments with the authority, resources, and information necessary to safely and effectively provide public safety in Indian country[.]" Id. at (b)(3).

232.    The ISDEAA requires the Secretary "to enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs *or portions thereof . . ..*" 25 U.S.C. § 5321(a)(1) (emphasis added).

233.    Defendants' claim that the Tribe "cannot lawfully carry out" the local portions of the SRO, DDE (including K-9 units), MMU, and IA programs directly contravenes 25 U.S.C. § 5321(a)(1), the Tribe's right to choose to contract only a portion of a program under ISDEAA, the cooperative mandate in the ILERA, and the purpose of the TLOA to empower tribal justice systems.

234.    The Tribe had successfully operated the SRO, DDE, MMU, and IA functions for years. Young Decl. at ¶ 65.  The Tribe also currently operates K-9 units.  Young Decl. at ¶ 63. For Defendants to take the position that this is now unlawful, with no analysis showing controlling legal authority to support that assertion, denies the Tribe its contracting rights under the ISDEAA and violates the "or portions thereof" option provided in ISDEAA.  *See* 25 U.S.C. § 5321(a)(1).

235.    In 2023, the Oglala Sioux Tribe signed a historic Memorandum of Mutual Support with the Pennington County Sheriff's Office and the Rapid City Police Department, and has also signed a Memorandum of Mutual Support with the Bennett County Sheriff's Department.  Young Decl. at ¶ 67.  The Tribe has also asked the Chief of Police to enter into these agreements with, and the Chief of Police is pursuing agreements with, the Jackson County Sheriff's Office, Fall River County Sheriff's Office, Oglala Lakota County Sheriff's Office, Todd County Sheriff's Office, and Mellette County Sheriff's Office. Young Decl. at ¶ 68.  It is simply inaccurate, factually and legally, for Defendants to

suggest that the proposal for the CI program cannot be lawfully carried out because the Tribe does not intend to cooperate with other law enforcement agencies.

236. There is nothing in the ISDEAA that requires cooperation with other jurisdictions to perform functions.  Otherwise, OJS would not have authority to enter into CI or LE contracts with tribes that have no cooperative agreements with surrounding county and state law enforcement agencies.  Notably, ILERA's cooperative mandate makes *the OJS* responsible for investigating criminal offenses "in cooperation with appropriate Federal and tribal law enforcement agencies[.]" 25 U.S.C. § 2802(c)(2).

237. It is contrary to the ISDEAA for Defendants to conclude that the Tribe may not contract the local portions of the SRO, DDE (including K-9 units), MMU, and IA programs because they are part of the agency's "nationwide" programs.  Such a conclusion violates the Tribe's rights under 25 U.S.C. § 5321(a)(1) to contract portions of programs—particularly in view of the Tribe's scope of work under its prior ISDEAA CI and LE contracts.

238. 25 U.S.C. § 5321(a)(1)(E) specifically requires the Defendants to contract functions "without regard to the organizational level within the Department that carries out such functions."

239. Defendants' refusal to contract the local portions of the SRO, DDE (including K-9 units), MMU, and IA programs violates 25 C.F.R. § 900.22 and § 900.24, which do not permit the Defendants to decline to contract on the basis that doing so will impact pre-existing services to other tribes.

240. For Defendants to assert that the Tribe may not contract the local portions of the SRO, DDE (including K-9 units), MMU, and IA programs because they are part of the agency's "nationwide" programs also ignores the fact that Congress acknowledged in enacting the

TLOA, "[T]ribal law enforcement officers are often the first responders to crimes on Indian reservations; and . . . tribal justice systems are often the most appropriate institutions for maintaining law and order in Indian country[.]" TLOA, § 202(a)(2)

241.   Defendants' actions put the Tribe in the untenable - and unacceptable - position of both foregoing its right to an ISDEAA contract and impeding the Tribe's ability to engage in the day-to-day activities that are necessary to maintain law and order on the Reservation. Defendants' action to decline that portion of the Tribe's contract proposal forces the Tribe to rely on the OJS's Rapid City-based DDE (including K-9 units) and MMU programs, both 80 miles away, to respond to drug distribution cases and missing persons calls.  This is particularly egregious when the Tribe receives an emergency call about a missing person and the first 48 hours are critical.  The OST DPS received 653 reports of attempts to locate, runaway, and missing persons from October 1, 2022, through September 30, 2023, yet OJS's Rapid City-based MMU Task Force offered assistance with no cases.  Young Decl. at ¶¶ 44-45; Young Decl. Ex. 5.

242.   Defendants' action to decline that portion of the Tribe's contract for local internal affairs also forestalls investigation of citizens' complaints against police officers because OJS internal affairs investigations have generally taken up to a year to complete and have sometimes taken up to three years to complete.  Young Decl. at ¶ 66.

243.   This delay has prevented Oglala Sioux Tribal officers from getting Special Law Enforcement Commissions while waiting for the results of the BIA's work and caused problems for the working relationship between the Tribal police and members of the local community.  *Id*.

244. The Tribe's contract proposal allows the Tribe to investigate and close internal investigations (other than possible federal Civil Rights violations), thereby allowing the Tribe to terminate or redeploy an officer in its already undersized police force, instead of waiting months or years to resolve a citizen's complaint.

245. The burden is on Defendants to demonstrate by "clear and convincing evidence" that the declinations were proper with specific facts justifying the declination. *Cheyenne River Sioux Tribe v. Kempthorne*, 496 F. Supp. 2d 1059, 1068 (D.S.D. 2007); 25 U.S.C. § 5321(a)(2)(E).

246. Nothing in the ISDEAA, the ILERA, or the TLOA authorizes Defendants to decline to contract the services requested in the Tribe's proposal.

247. Defendants' refusal to contract portions of the SRO, DDE (including K-9 units), MMU, and IA programs directly contravenes the ISDEAA's express statutory commitment to carry out a meaningful Indian self-determination policy, which transitions away from federal domination of programs for Indians to allow meaningful participation by Indian people in the planning conduct and administration of federal programs, and to further the goal of "supporting and assisting Indian tribes in the development of strong and stable tribal governments[.]" 25 U.S.C. § 5302(b).

248. Defendants' declination of the Tribe's request to contract portions of the SRO, DDE (including K-9 units), MMU and IA programs violated 25 U.S.C. § 5321(a)(2) and 25 U.S.C. § 5324(i)(1), by failing to engage with the Tribe and other affected tribes to redesign these programs, before issuing the declination to contract.

249. 25 U.S.C. § 5321(f) requires that the Secretary "at all times negotiate in good faith to maximize implementation of the self-determination policy[.]" Defendants' refusal to

contract the services discussed herein violates § 5321(f).  Defendants cannot claim "good faith" negotiations when Defendants were unwilling to discuss the contract price or the contract's scope of work prior to issuing the partial denial letters.

250.    Defendants engaged in bad faith negotiations when they notified the Tribe that they were only willing to approve a specific contract price and prior scope of work, which they arrived at in the absence of any contract negotiation.

251.    In the absence of any negotiations, two take-it-or-leave-it-letters do not meet the "good faith" requirements of 25 U.S.C. § 5321(f).

252.    Defendants' decision to decline to contract the requested services violate the Indian self-determination obligations imposed under the ISDEAA, 25 U.S.C. § 5324(c)(2), and the regulatory requirements for Defendants to:

    (1)    afford tribes the flexibility and discretion needed "to design contractable programs to meet the needs of their communities . . .."  25 C.F.R. § 900.3(b)(3);

    (2)    interpret federal laws and regulations in a manner that facilitates the inclusion of programs or portions of programs for the benefit of Indians in ISDEAA contracts. 25 C.F.R. § 900.3(b)(8); and

    (3)    permit annual renegotiation of "[t]he amounts of such contracts . . . to reflect changed circumstances and factors, including, but not limited to, cost increases beyond the control of the tribal organization."  25 U.S.C. § 5324(c)(2).

253.    Defendants offered no technical assistance that would "provide assistance to the tribal organization to overcome the stated objections" as required by 25 U.S.C. § 5321(b)(2). Young Decl. ¶ 50.

254.    The Tribe requests that the Court set aside the decision to decline the Tribe's proposals to operate portions of the SRO, DDE (including K-9 units), and MMU, and IA programs as being arbitrary and capricious and otherwise not in accordance with law.

255.   The Tribe also requests a declaratory judgment that Defendants, as a matter of law, were required to do the following: (1) approve the Tribe's proposed contracts to operate portions of the SRO, DDE, and local MMU, and IA programs and approve the Tribe's proposed AFAs for FY 2023 related to those programs; (2) award the amended contracts and the new AFAs as proposed for the operation of those programs; and (3) add to the contracts the full amount of Title I funds pursuant to § 106(a)(1) of the ISDEAA for the operation of those programs.

256.   The Tribe further requests the Court to enter an Order compelling agency action unlawfully withheld or unreasonably delayed pursuant to 5 U.S.C. § 706(1), namely compelling Defendants to: (1) approve the Tribe's proposed contracts to operate portions of the SRO, DDE, and local MMU and IA programs and approve the Tribe's proposed AFA for FY 2023 related to those programs; (2) award the amended contracts and the new AFAs as proposed for the operation of those programs; and (3) add to the contracts the full amount of Title I funds pursuant to § 106(a)(1) of the ISDEAA for the operation of those programs.

## SEVENTH CLAIM FOR RELIEF

### Violation of the APA, 5 U.S.C. §§ 551-596 and §§ 701-706

257.   The Tribe realleges the preceding paragraphs and incorporates them by this reference.

258.   Because Congress, through the 1921 Snyder Act "specifically appropriated funds" for tribal law enforcement services and also placed, through the TLOA and the ILERA, "statutory conditions upon the expenditure" of those funds, Defendants' decisions related to the provision of tribal law enforcement services are judicially reviewable. *See Yankton Sioux Tribe v. U.S. Dept. of Health & Hum. Servs.*, 869 F. Supp. 760, 765 (D.S.D. 1994).

259.   Defendants arbitrarily and capriciously limited the Tribe's base contract amounts to the artificially low amounts set by the BIA over 20 years ago, which ignores the United States'

treaty and trust obligations, funds significantly fewer police officers on the Pine Ridge Reservation than the Defendants were funding in 1879, and funds fewer officers than its own minimum standard of 2.8 officers per 1,000 service population prescribes.  Such funding decision is arbitrary and capricious, an abuse of discretion, and contrary to law.

260.    The Defendants' base funding decisions violate ISDEAA's § 106(a)(1) obligation to provide the "amount of funds . . . [which] shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof *for the period covered by the contract*."  25 U.S.C. § 5325(a)(1) (emphasis added).

261.    The ISDEAA does not permit Defendants to ignore the obligations the United States made in prior treaties and pick a funding amount it used more than 20 years ago and impose that historic base funding amount on a Tribe as its current ISDEAA § 106(a)(1) base funding amount.   Rather, Congress directs that the § 106(a)(1) amount represents what the "Secretary would have otherwise provided for the operation of the programs" at the time of contracting.  Given the Secretary's treaty and trust obligations, current law enforcement service population, the size of the Reservation, the distance between its residential communities, the crime statistics, and the 165,799 calls for assistance to OST DPS, this cannot be the amount which is based upon the amount the Secretary provided more than twenty years ago, when relevant conditions were vastly different, and cannot be the amount provided during a point in time when the amount of funds the Secretary "would have otherwise provided" was temporarily and artificially lowered by a substantial amount due to outside short-term DOJ funding.

262.    The BIA and OJS January 25, 2023 partial declination decisions on the LE and CI funding amounts violate the "[a]dditional responsibilities" of the Secretary, BIA, and OJS pursuant

to 25 U.S.C. § 2802(c) (carrying forward the 1825, 1851, and 1868 Treaty obligations of the United States Government to enforce Federal law through the investigation, arrest, and punishment of offenders).

263.    Defendants' January 25, 2023 partial declination decision on the LE and CI funding amounts violates the purpose of ISDEAA, which is to end the "prolonged Federal domination of Indian service programs" by giving "Indian people an effective voice in the planning and implementation of programs for the benefit of Indians which are responsive to the true needs of Indian communities[.]"  25 U.S.C. § 5301(a)(1).

264.    Defendants' decision to calculate the Tribe's ISDEAA § 106(a)(1) amounts by using a base amount expended from TPA funds in 1999 renders the partial disapprovals of the Tribe's contract proposals deficient, arbitrary and capricious, and otherwise not in accordance with law.  Nothing in the ISDEAA, the ILERA, or the TLOA authorizes such an outcome.

265.    Because Defendants failed to comply with their obligations under the Tribe's treaties, the 1877 Act, the 1921 Snyder Act and implementing law in the ISDEAA, the ILERA and the TLOA, the Tribe is entitled to declaratory and injunctive relief under the APA, in addition to remedies that may be available directly under the ISDEAA, for Defendant's failure to adequately fund the Tribe's § 106(a)(1) amount for LE and CI services.

266.    For these reasons, the Tribe is entitled to a declaratory judgment that Defendants violated the APA, 5 U.S.C. §§ 551-596, 701-706, by relying on an inaccurate, artificially lowered amount in determining the Tribe's base law enforcement and criminal investigations contract amounts and not making any determination as to the § 106(a)(1) amounts required for the "operation of the programs or portions thereof for the period covered by the contract" in violation of 25 U.S.C. § 5325(a).

267. The Tribe is also entitled to an order compelling agency action unlawfully withheld or unreasonably delayed pursuant to 5 U.S.C. § 706(1), namely compelling Defendants to comply with the statutory requirements of 25 U.S.C. § 2802 and 25 U.S.C. § 5325(a) by properly funding the Tribe's § 106(a)(1) amounts at a level sufficient to adequately and effectively enforce federal and Tribal law on the Reservation through investigation, arrest, and punishment of offenders.

## **PRAYER FOR RELIEF**

WHEREFORE, the Tribe prays for the following relief:

1.  A declaratory judgment stating that:

    A.  The United States has a treaty and trust responsibility to provide adequate and effective law enforcement to the Tribe and its members within the Pine Ridge Reservation, including the prompt and diligent investigation and reporting of all complaints of crime, and the arrest and punishment of all offenders who violate federal or Tribal law or otherwise threaten or harm the Tribe or its property, or the person or property of any Tribal member;

    B.  Defendants have a statutory and trust obligation to the Tribe to provide for and adequately equip a sufficient number of law enforcement and criminal investigations officers on the Pine Ridge Reservation to reasonably ensure that the United States' treaty, statutory, and trust obligations are met, and that the Defendants are providing for the prompt and diligent investigation and reporting of all complaints of crime, and the arrest and punishment of all offenders who violate federal or Tribal law or otherwise threaten or harm the Tribe or its property, or the person or property of any Tribal member, and that Defendants are violating those responsibilities to the Tribe; and

C.  Defendants violated 25 U.S.C. § 5321(a)(2)(E) by improperly declining those portions of the Tribe's programs that are contractable by the Tribe under 25 U.S.C. § 5321 (a)(1); and

D.  Defendants have violated the APA and 25 U.S.C. § 5321(a)(2)(D) by partially declining those portions of the Tribe's contract proposals, which Defendants determined to be "in excess" of the applicable § 106(a)(1) amounts, based upon an irrational, arbitrary, and unreasonable base amount that it unilaterally arrived at over twenty years ago, which is far below the Tribe's actual needs; far below the amount that the federal government obligated itself to in the 1825, 1851, and 1868 Treaties, the 1877 Act, and far below the amount that the BIA concluded was necessary in its own Gap Analysis, Ex. 1 at 3, and in the 2020 OJS TLOA Report, Ex. 2.  Additionally, that Defendants knew such amounts were based upon arbitrary and incomplete information that Defendants chose at a time when they knew that the Tribe was supplementing its law enforcement services budget with temporary and long since expired DOJ grant funds; and

E.  Defendants violated their trust duty owed to the Tribe arising under the 1825, 1851, and 1868 Treaties, as carried forward in the 1921 Snyder Act, the ILERA , the TLOA, and federal common law, to ensure that the law enforcement services provided to the Tribe are effectively carried out in a manner that reasonably ensures the investigation and reporting of all crimes, and the timely arrest and punishment of offenders; and

F.  Defendants' inadequate funding of the Tribe's law enforcement programs violates the rights of the Tribe and its members under the 1825, 1851, and 1868 Treaties, the 1877

Act, the 1921 Snyder Act, the ILERA, the TLOA, and violates the Defendants' trust responsibility to the Tribe; and

G. The Defendants have a trust obligation to provide an accounting to the Tribe of the funds and uses of funds appropriated to Defendants by Congress for law enforcement services from 1998 to the present time.

2.     An Order compelling Defendants to:

A. Fund and equip a minimum of 2.8 Tribal law enforcement officers per 1,000 law enforcement service population, as defined by the scope of federal and Tribal jurisdiction, according to the BIA standard for an adequate law enforcement program articulated in its own Gap Analysis and its TLOA Reports to Congress, and to base such funding and equipment on the aforementioned law enforcement service population, the distance between on-reservation residential communities, the Reservation size, the present day number of crimes and service calls, in compliance with the United States' treaty and trust obligations; and

B. Comply with 25 U.S.C. § 5321(a) by approving the Tribe's proposal to contract and operate portions of the Division of Drug Enforcement (including K-9 units), Missing and Murdered Unit, Internal Affairs, and School Resource Officer Programs; and

C. Comply with their treaty and trust duties to the Tribe by taking sufficient measures to ensure effective, prompt, and diligent investigation and reporting of all crimes on the Reservation and the immediate arrest and punishment of offenders; and

D. To provide a detailed accounting to the Tribe of its appropriations requests to the DOI, to OMB and to Congress and the responses thereto; and an accounting of the funds received and used by each individual division of BIA and OJS from 1998 through the

present date for law enforcement services. This accounting should include the following: (1) all OJS requests to DOI for inclusion in the President's budget request to Congress, and all responses thereto; (2) all requests made from DOJ to OMB for the same purpose, and the responses thereto; (3) all direct, contracted and administrative funding provided to OJS by Congress and/or DOI, including all specialty programs (including, but not limited to, Division of Drug Enforcement (including K-9 units), Missing and Murdered Unit, School Resource Officer Program, Police Academy, Internal Affairs Division, each District, the Central Office, and each tribal law enforcement location (whether direct service or tribally contracted)).  Such accounting shall be by Tribe or location, fiscal year, amount, and scope of work, and shall note: (1) the service population of each tribe served under OJS; (2) all payments of bonuses, special employee awards, or incentive payments made to federal OJS employees; (3) the GS rating for all OJS full-time equivalent employees; and (4) such other accounting information as the court deems appropriate.

3.      For an Order temporarily, preliminarily, and permanently restraining Defendants from continuing to assign a base ISDEAA law enforcement funding amount to the Tribe based upon the Tribe's 1999 TPA law enforcement budget.

4.      Award to the Tribe all of its costs, fees and expenses incurred in this lawsuit, including attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, and other applicable statutes, and under general principles of law and equity.

5.      Such other and further relief as this Court may deem just and proper.

Dated: January 24, 2024

Respectfully submitted,

Rebecca Kidder (SD Bar No. 2774)
Jillian Smith (SD Bar No. 5471)
Peebles Kidder Bergin & Robinson LLP
1818 W. Fulton Street, Suite 201
Rapid City, SD 57702
Telephone: (605) 791-1515
Email: rkidder@ndnlaw.com
Email: jsmith@ndnlaw.com

Conly Schulte *Pro hac vice pending*
Peebles Kidder Bergin & Robinson LLP
945 Front St.
Louisville, CO 80007
Telephone: (303) 284-8228
Email: cschulte@ndnlaw.com

Ben Fenner *Pro hac vice pending*
Peebles Kidder Bergin & Robinson LLP
401 9th Street, Suite 700
Washington, DC 20004
Telephone: (202) 450-4887
Email: bfenner@ndnlaw.com

Steven J. Bloxham *Pro hac vice pending*
Peebles Kidder Bergin & Robinson LLP
2020 L Street, Suite 250
Sacramento, CA 95811
Telephone: (916) 441-2700
Email: sbloxham@ndnlaw.com

*Attorneys for the Oglala Sioux Tribe*

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

Oglala Sioux Tribe

**DEFENDANTS**

The United States of America (see attachment for others)

**(b)** County of Residence of First Listed Plaintiff   Oglala Lakota County, S
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Washington DC
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attachment

Attorneys *(If Known)*

---

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 2  U.S. Government Defendant
- [ ] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

---

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*                    Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | | [ ] 370 Other Fraud | **LABOR** | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [x] 890 Other Statutory Actions |
| | | | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

---

**V. ORIGIN** *(Place an "X" in One Box Only)*

- [ ] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
5 U.S.C. § 702; 25 U.S.C. §§13, 2801 and 3601;

Brief description of cause:
Violation of Treaty obligations and ISDEAA

**VII. REQUESTED IN COMPLAINT:**

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   [ ] Yes   [x] No

**VIII. RELATED CASE(S) IF ANY**   *(See instructions):*

JUDGE   Chief Judge Roberto A. Lange

DOCKET NUMBER   5:22-cv-05066-RAL

DATE
1/11/2024

SIGNATURE OF ATTORNEY OF RECORD
/s/ Rebecca Kidder

**FOR OFFICE USE ONLY**

RECEIPT #              AMOUNT              APPLYING IFP              JUDGE              MAG. JUDGE

<u>Attachment to Civil Cover Sheet</u>

I.(b). Plaintiff's County of Residence:
Oglala Lakota County, SD

I.(c). Plaintiff's Attorneys:
Rebecca Kidder, SD Bar # 2774
Peebles Kidder Bergin & Robinson
1818 W. Fulton Street, Suite 201
Rapid City, SD 57702
Tel. (605) 791-1515
rkidder@ndnlaw.com
Lead Attorney

Conly Schulte, CO Bar # 44370 *Pro hac vice pending*
Peebles Kidder Bergin & Robinson
945 Front St.
Louisville, CO 80027
Tel. (303) 284-8228
cschulte@ndnlaw.com

Ben Fenner, DC Bar # 1011266 *Pro hac vice pending*
Peebles Kidder Bergin & Robinson
401 9TH STREET N.W., SUITE 700
WASHINGTON, DC 20004
Tel. (202) 450-4887
bfenner@ndnlaw.com

Steven J. Bloxham, CA Bar # 096384 *Pro hac vice pending*
Peebles Kidder Bergin & Robinson
2020 L. Street, Suite 250
Sacramento, CA 95811
Tel. (916) 441-2700
sbloxham@ndnlaw.com

Jillian Smith, SD Bar # 5471
Peebles Kidder Bergin & Robinson
1818 W. Fulton Street, Suite 201
Rapid City, SD 57702
Tel. (605) 791-1515
jsmith@ndnlaw.com

I. Defendants:
THE UNITED STATES OF AMERICA
THE UNITED STATES DEPARTMENT OF THE INTERIOR
THE BUREAU OF INDIAN AFFAIRS
Department of the Interior: Debra HAALAND, Secretary of the Interior

1

Bureau of Indian Affairs: Richard MELVILLE, Deputy Bureau Director, Bureau of Indian Affairs- Office of Justice Services
Bureau of Indian Affairs: John BURGE, Special Agent in Charge of District 1, Bureau of Indian Affairs - Office of Justice Services
Bureau of Indian Affairs: Darryl LACOUNTE, Director, Bureau of Indian Affairs  Bureau of Indian Affairs: Gina DOUVILLE, Superintendent of Indian Affairs, Bureau of Indian Affairs